65 A.3d 339

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Stephen Rex EDMISTON, Appellant.**

Supreme Court of Pennsylvania.

Submitted Sept. 26, 2011.

Decided April 24, 2013.

Renee Hurtig Edelman, Esq., Federal Community Defender Office, Eastern District of PA, James H. Moreno, Esq., Defender Association of Philadelphia, for Appellant.

Marissa Boyers Bluestine, Esq., for Pennsylvania Innocence Project, Appellant Amicus Curiae.

Amy Zapp, Esq., PA Office of Attorney General, James Patrick Barker, Esq., for Appellee.

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice BAER.

Stephen Rex Edmiston (Appellant) appeals from the denial of relief on two distinct Post–Conviction Relief Act (PCRA) petitions. *See* 42 Pa.C.S. §§ 9541–9546. First, Appellant appeals from the denial of relief on the claims raised in his second PCRA petition, which we affirm because the contentions raised therein are untimely. Second, Appellant seeks review of the PCRA court's denial of his motion for postconviction DNA testing, filed pursuant to 42 Pa.C.S. § 9543.1. We affirm the denial of the DNA testing petition for a different reason than that offered by the PCRA court. We conclude that Appellant failed to demonstrate that his DNA testing petition was made "in a timely manner and for the purpose of demonstrating [his] actual innocence and not to delay the execution of sentence or administration of justice." 42 Pa.C.S. § 9543.1(d)(1)(iii).

We set forth the facts of this case in our two prior opinions, *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993) (*Edmiston I* ) and *Commonwealth v. Edmiston*, 578 Pa. 284, 851 A.2d 883 (2004) (*Edmiston II* ). To summarize, on July 14, 1989, after a non jury trial, Appellant was found guilty of murder in the first degree, rape, statutory rape, and involuntary deviate sexual intercourse. The Commonwealth's evidence supporting these convictions showed that Appellant

kidnapped the two-year old victim, Bobbi Jo Matthew, from her bedroom in the early morning hours of October 5, 1988, drove her to a remote location, and proceeded to inflict separate and gruesome injuries on her. As we detailed in *Edmiston I*, the evidence demonstrated the following:

Here, a two-year-old girl, weighing thirty-four pounds and standing thirty-six inches tall, suffered the following serious injuries: scalping, blunt force to her torso, obliteration of her genital area, burning of her body and a skull fracture. She was scalped by being cut with a sharp knife-like instrument from the ear up across the front hair line of her forehead and down to the other ear. Her scalp was then peeled back to the nape of her head exposing the entire skull. Blunt force trauma to her chest and stomach was so forceful that it caused the tearing of her liver and lungs. This force was also one of two possible causes of two feet of the infant's intestines to protrude from her genital area. (The other possible cause was pulling the intestines out of the genital area). The genital area of the two-year-old child was completely obliterated and ripped to such an extent that there was only one large and bloody cavity where there originally were the anal and vaginal orifices. There were also areas of burning of the infant's body, many other lacerations and abrasions and a skull fracture.

All of these separate and gruesome injuries occurred while the child was living.

*Edmiston I,* 634 A.2d at 1084.

The victim lived with her father, Harold Matthew, and grandmother, Nancy Dotts, and several of Ms. Dotts' young children. Appellant was acquainted with the victim's family, and his uncle, Robert Brown, was Ms. Dotts' boyfriend. On the night of October 4, 1988, the victim went to bed in a bedroom she shared with three other children. Two children saw a man in the bedroom talking to the victim at approximately 3:30 in the morning, whom they believed to be Ms. Dotts' boyfriend, Mr. Brown. Mr. Matthew also observed a man in the house at that time, who said goodbye as he left. When the victim's family discovered that she was missing on

the morning of October 5, 1988, they came to believe that the man who had been in the house in the middle of the night was Appellant.

Police arranged an interview with Appellant the following day. At the police barracks, Appellant waived his rights and consented to a search of his pickup truck, which revealed blood on the front seat, a blanket with fine, blond hairs, a blood-stained towel, bloody scissors, and a pair of shorts that the victim's family identified as those the victim wore to bed the night she disappeared.

The police confronted Appellant with what they discovered in his truck, voiced their suspicion, and asked him if he killed the victim. Although Appellant initially denied involvement, he soon began to waver. The police asked Appellant to reveal the location of the body. Appellant refused, but when the police asked Appellant to draw a map to the location of the victim's body, he complied. When asked what the police would find at that location, Appellant responded that they would find "a dead raped little girl." Notes of Testimony (N.T.) 7/10/89 at 103. He also stated that he did not know why he did it and began to cry. According to police, Appellant explained that the rape occurred in his pick-up truck, that he hit the victim several times with his fist, and ultimately covered her body with branches. *Id.* at 103–105.

The police kept Appellant's hand-drawn map in a notebook, and, because there was no photocopying equipment available, copied the map onto another piece of paper by hand. With the copy of the map in hand, police attempted to find the victim's body. They enlisted the help of a local resident, Roger W. Kruis, who indicated his familiarity with the landmarks on the map and accompanied the police to the location. Police recovered the body at the location specified on the map. Additionally, investigators matched the tire tread and wear pattern found near the victim's body with the tires on Appellant's truck.

An autopsy was performed by Dr. Katherine Jasnosz of the Allegheny County Coroner's Office, during which her staff

took black and white photographs and color slides (hereafter, the Coroner's photographs). N.T. 7/7/89 at 110. Dr. Jasnosz took oral as well as recto-vaginal smears and swabs from the victim. N.T. 7/7/89 at 130–31. Testing of blood samples taken from Appellant's truck resulted only in identification of the blood as type "O," which matched the blood type of both Appellant and the victim. As to the smears and swabs obtained by the Coroner, the laboratory the Commonwealth chose to conduct DNA testing reported that there was insufficient material for such DNA analysis. The defense chose another laboratory to conduct its own testing, which reported that it was able to extract DNA and that the DNA was from the victim. During a pre-trial conference, the defense indicated to the trial court that because Appellant's DNA was not found on the samples it submitted to its laboratory, it chose to decline further testing, and Appellant indicated his agreement with this decision.

Appellant's defense was that he was innocent, he was too drunk to commit these crimes or form the intent to commit these crimes, he spent a good part of the night in a drunken sleep inside his truck parked outside his mother's house, the Commonwealth's forensic evidence did not identify him as the perpetrator, and he attempted to point suspicion at his uncle Robert Brown, whom he resembled.

Appellant was found guilty at a bench trial and sentenced to death by a jury on October 5, 1989.[1] We affirmed on direct appeal. *Edmiston I*, 634 A.2d 1078. On May 29, 1996, Appellant filed his first petition for collateral relief under the PCRA. Following several amendments and an evidentiary hearing, the PCRA court denied the petition. On appeal from the denial of PCRA relief, this Court affirmed. *Edmiston II.*

1. The jury unanimously found two aggravating circumstances: that the killing was committed while in the perpetration of a felony (rape and deviate sexual intercourse), *see* 42 Pa.C.S. § 9711(d)(6), and that the offense was committed by means of torture, *see* 42 Pa.C.S. § 9711(d)(8). The jury found that the aggravating circumstances outweighed the sole mitigating circumstance, which the Commonwealth had stipulated to, that Appellant had no significant history of prior criminal convictions, *see* 42 Pa.C.S. § 9711(e)(1).

On June 13, 2005, Appellant filed a second petition for PCRA relief (styled as a "Petition for Habeas Corpus Relief Under Article I, Section 14 of the Pennsylvania Constitution and for Statutory Relief Under 42 Pa.C.S. § 9545(b)(1)(i) & (ii)") (hereafter, Second PCRA Petition) premised upon the Coroner's photographs, which he claimed were newly discovered. In response to the Commonwealth's motion for a more specific pleading, on August 12, 2005, Appellant amended the Second PCRA Petition (hereafter, Amended PCRA Petition). On February 18, 2009, the National Academies of Science published a study entitled Strengthening Forensic Science in the United States: A Path Forward (hereafter, the NAS Report), which prompted the filing of Appellant's "Supplemental Petition for Post–Conviction Relief Based Upon Additional Newly Discovered Evidence," (hereafter, Supplemental PCRA Petition) on April 17, 2009. Appellant also filed a Motion for Post–Conviction DNA Testing pursuant to 42 Pa.C.S. § 9543.1, which the PCRA court denied on September 30, 2009.

On December 23, 2009, following an evidentiary hearing related to the timeliness of the Second PCRA Petition, as amended and supplemented, the PCRA court dismissed the claims raised therein as untimely, with the exception of one claim premised on the NAS Report related to hair comparison analysis. Following a hearing on the merits of this sole remaining claim, the PCRA court denied relief on April 26, 2010.

 On appeal from the denial of PCRA relief, our standard and scope of review is limited to determining whether the PCRA court's findings are supported by the record and without legal error. *Commonwealth v. Breakiron*, 566 Pa. 323, 781 A.2d 94, 97 n. 4 (2001). Our review of questions of law is de novo. *Commonwealth v. Fahy*, 598 Pa. 584, 959 A.2d 312, 316 (2008).

A PCRA petition, including a second or subsequent petition, must be filed within one year of a final judgment, unless the petitioner alleges and proves that he is entitled to one of three

exceptions to this general rule, and that the petition was filed within 60 days of the date the claim could have been presented:

(b) Time for filing petition.—

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

42 Pa.C.S. § 9545(b).

■ Appellant relies on the exceptions for governmental interference and previously unknown facts. *See* 42 Pa.C.S. § 9545(b)(1)(i) & (ii). The proper questions with respect to these timeliness exceptions are whether the government interfered with Appellant's ability to present his claim and whether Appellant was duly diligent in seeking the facts on which his claims are based. *Commonwealth v. Stokes,* 598 Pa. 574, 959 A.2d 306, 310 (2008); *Commonwealth v. Abu–Jamal,* 596 Pa. 219, 941 A.2d 1263 (2008) (concluding that not only must a petitioner assert that the facts upon which the claim is predicated were not previously known to the petitioner, but also that they could not have been ascertained through due dili-

gence); *Commonwealth v. Hawkins,* 598 Pa. 85, 953 A.2d 1248 (2006) ("although a *Brady* claim may fall within the governmental interference exception, the petitioner must plead and prove that the failure to previously raise these claims was the result of interference by governmental officials, and that the information could not have been obtained earlier with the exercise of due diligence.").

■ In the case of both exceptions on which Appellant relies, there is the requirement that he filed his claims within 60 days of the date the claim could have been presented. 42 Pa.C.S. § 9545(b)(2). We have established that this 60–day rule requires a petitioner to plead and prove that the information on which his claims are based could not have been obtained earlier despite the exercise of due diligence. *Commonwealth v. Albrecht,* 606 Pa. 64, 994 A.2d 1091 (2010); *Stokes,* 598 Pa. 574, 959 A.2d 306; *Commonwealth v. Marshall,* 596 Pa. 587, 947 A.2d 714, 720 (2008).

■ The time requirements established by the PCRA are jurisdictional in nature; consequently, Pennsylvania courts may not entertain untimely PCRA petitions. *Commonwealth v. Watts,* 611 Pa. 80, 23 A.3d 980 (2011); *Commonwealth v. Brown,* 596 Pa. 354, 943 A.2d 264, 267 (2008); *Commonwealth v. Robinson,* 575 Pa. 500, 837 A.2d 1157, 1161 (2003). We have repeatedly stated it is the appellant's burden to allege and prove that one of the timeliness exceptions applies. *See, e.g., Commonwealth v. Beasley,* 559 Pa. 604, 741 A.2d 1258, 1261 (1999). Whether Appellant has carried his burden is a threshold inquiry prior to considering the merits of any claim.

Appellant's Second PCRA Petition is untimely on its face. As Appellant's judgment became final prior to the 1995 enactment of the time requirements and amendments to the PCRA, he had one year from the effective date of the PCRA amendments to file a timely petition. Indeed, this rule accounted for Appellant's first PCRA petition being timely. *Edmiston,* 851 A.2d at 887 n. 1. We are now presented with Appellant's second petition, which was filed on June 13, 2005, and the Supplement thereto, filed on April 17, 2009. These filings are

clearly untimely. Therefore, unless one of the statutory exceptions apply, the courts lack jurisdiction to consider the claims raised therein.

We first address the specific contentions that the PCRA court found were untimely. Appellant relies on the exceptions of Section 9545(b)(1)(i) and (ii) to advance these issues. He asserts that the exception for governmental interference at Section 9545(b)(1)(i) applies because the Commonwealth interfered with the presentation of his claims by failing to provide him with mandatory discovery and exculpatory information, specifically, the Coroner's photographs, statements by Mr. Kruis indicating that the map police showed him, which led to the discovery of the victim's body, was not the one drawn by Appellant, and prior statements of Commonwealth witness Mr. Brown. Appellant further argues that these three pieces of evidence, which he discovered independently, constitute newly discovered facts within the exception contained at Section 9545(b)(1)(ii). Appellant also argues that he raised these claims on June 13, 2005, in the Second PCRA Petition, within 60 days of learning of the evidence on which each claim is based, thereby complying with Section 9545(b)(2).

The first claim we address is premised upon the Coroner's photographs, specifically, 70 black and white photographs and 53 35mm color photographic slide transparencies of the victim's body, which were taken during the victim's autopsy on October 7, 1988, by the Allegheny County Coroner's Office. During the autopsy, Pennsylvania State Police Trooper Vanneman also took color photographs of the victim's body. Appellant asserts that despite defense counsel's repeated requests for discovery, physical evidence, and records made in the course of scientific testing, the prosecutor did not deliver the actual Coroner's photographs to trial counsel. Instead, it made available only the 18 color photographs taken by the state trooper during the victim's autopsy.[2] Appellant acknowl-

2. Appellant asserts that the Coroner's photographs and slides revealed that many of the victim's injuries resulted from her having been run over by a motor vehicle backing up, and were not the result of her having been manually scalped, purposefully burned, or raped so force-

edges that the prosecutor marked several of the Coroner's photographs as exhibits, but argues that this was insufficient to attribute awareness of the photographs to trial counsel because the prosecutor represented to the court that they were not material to the case, and they were not admitted into evidence.

According to Appellant, it was not until February 2005 that he was able to access the Coroner's photographs and slides.[3] Specifically, the Allegheny County Coroner's Office advised Appellant that it possessed the Coroner's photographs on February 17, 2005; upon Appellant's request, on March 23, 2005, he received 34 black and white photographs and, on April 14, 2005, copies of the 53 color photographic slides. Appellant had the slides enlarged sufficiently to have his forensic experts analyze them, and, on May 16, 2005, they rendered their opinions that the photographs were exculpatory. Appellant raised this claim in his Second PCRA Petition on June 13, 2005, which he asserts was within 60 days his experts' determination that the withheld Coroner's photographs were exculpatory.

The PCRA court found that this claim was untimely because Commonwealth witnesses referred to the Coroner's autopsy photographs several times during trial, and, therefore, trial counsel was aware of them. Because trial counsel was aware of the Coroner's photographs as early as 1989, the PCRA court held that the Second PCRA Petition raising this claim, filed on June 13, 2005, was not filed within "60 days of the date the claim could have been presented" as required by Section 9545(b)(2) and was therefore untimely.

fully that the trauma resulted in her evisceration and death, acts which the Commonwealth medical examiner ascribed at trial and sentencing to Appellant, and which formed the evidentiary basis for the determination that Appellant possessed the requisite specific intent to be guilty of first-degree murder and for the two aggravating circumstances found by the jury: that Appellant tortured the victim and raped her. According to Appellant, the trooper's photographs do not depict all of the victim's injuries nor include close range images of the injuries, and were therefore not a substitute for the Coroner's extensive photographs.

3. Appellant does not specify when he first learned of the existence of the Coroner's photographs.

Appellant disputes the PCRA court's finding that trial counsel knew of the Coroner's photographs at trial. Rather, he argues that counsel was unaware of this evidence at the time of trial because the Commonwealth did not provide it during discovery. Recognizing the diligence component of the timeliness exception set forth at Section 9545(b)(1)(ii), Appellant argues that trial counsel diligently attempted to obtain all discoverable evidence from the Commonwealth, and was entitled to rely on the Commonwealth's representations that it has provided all mandatory and requested discovery. *See Banks v. Dretke*, 540 U.S. 668, 695, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *United States v. Bagley*, 473 U.S. 667, 682–83, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). According to Appellant, whether counsel acted diligently in ascertaining the facts upon which a claim is based must be measured in the context of counsel's reasonable reliance on the Commonwealth's response to repeated discovery requests, and, in the context of this case, counsel exerted due diligence in relying on the Commonwealth's representations such that these claims are timely in accord with the exceptions for governmental interference at Section 9545(b)(1)(i) and previously unknown facts at Section 9545(b)(1)(ii).

Similarly, with regard to his obligation to plead and prove that the information on which this claim is based could not have been obtained earlier despite the exercise of due diligence, *see* 42 Pa.C.S. § 9545(b)(2); *Stokes*, 598 Pa. 574, 959 A.2d 306; *Marshall*, 947 A.2d at 720, Appellant argues that the PCRA court required perfect vigilance from trial counsel rather than due diligence. *See Commonwealth v. Selenski*, 606 Pa. 51, 994 A.2d 1083, 1089 (2010) (explaining that due diligence in another context "does not require perfect vigilance and punctilious care, but merely a showing the [party] has put forth reasonable effort."). Alternatively, Appellant argues that if the claims are untimely due to the ineffectiveness of prior counsel, then the PCRA as applied violates due process and his right to the effective assistance of counsel.

The record supports the PCRA court's conclusion that trial counsel knew about the Coroner's photographs at the

time of trial. Specifically, Commonwealth witnesses made several references to the photographs during trial and distinguished between the Coroner's photographs and those taken by the state trooper during the autopsy. During a pretrial hearing, Dr. Katherine Jasnosz of the Allegheny County Coroner's Office, who performed the autopsy, testified that her office took photographs during the autopsy and that a state trooper took photographs as well. N.T. 1/30/89 at 26. During her guilt phase testimony, Dr. Jasnosz referred to the Coroner's photographs in black and white and to color slides. N.T. 7/7/89 at 110 ("The standard procedure in the case of a suspected homicide and/or child abuse case includes photographing the body, as we received it. That includes black and white and color photographs. Actually the color photographs are slides."). At a deposition, at which Appellant was present, Dr. Jasnosz explained her office's practice of taking official photographs during an autopsy. N.T. 9/11/1989 at 19–21 (explaining the office's procedure with regard to suspicious deaths of photographing the body as they receive it in black and white and in color, with the black and white photographs printed on 8 by 10 inch glossy paper and the color photographs being printed on photographic slides, and taking more such pictures after physical evidence has been gathered and after the body is washed); *Id.* at 21 (indicating that this procedure was followed during the autopsy of the victim).

Additionally, during the Commonwealth's proffer of the testimony of John W. Barron, the Coroner of Cambria County, during the penalty phase, the prosecutor, the trial court, and trial counsel all referred to "slides taken in conjunction with the autopsy performed at the Allegheny County Coroner's Office." N.T. 10/2/89 at 147–48. Mr. Barron again referred to the autopsy slides in describing the injuries he observed. *Id.* at 160.

Indeed, Appellant acknowledged that trial counsel was aware of the Coroner's photographs when the prosecutor marked them as exhibits during the testimony of Mr. Barron. Amended PCRA Petition at 4, n.7; 28. At the PCRA hearing on timeliness, trial counsel testified that he must have been

aware of the Coroner's photographs and expressed his opinion that he should have taken steps necessary to view them or obtain copies. N.T. 8/27/09, 132–33, 138–39. Additionally, the PCRA court credited the testimony of an employee of the Allegheny County Coroner's Office, which possessed the Coroner's photographs, that copies of these photographs could have been obtained by the presentation of a specific request or a motion for discovery sanctions, if required.

As the PCRA court found, therefore, Appellant has not carried his burden of establishing that he was not aware of the factual predicate of his claim at the time of trial and that succeeding counsel could not, with the exercise of due diligence, have presented this claim more than 60 days before he raised it on June 13, 2005. We cannot say that a petitioner who is aware of the factual basis of his claim but who raises the claim over 15 years later complied with the jurisdictional, statutory requirement to file his claim within 60 days of the date the claim could have been presented. 42 Pa.C.S. § 9545(b)(2). *See Stokes,* 959 A.2d at 310–11 (holding that where the petitioner was aware of the records supporting his claim for years before he sought them, he failed to establish the due diligence required to excuse his inaction).

 Turning to Appellant's alternative argument that if his claims are untimely due to prior counsel's ineffectiveness for failing to exercise due diligence, then our refusal to entertain them amounts to a due process violation and a violation of his right to counsel, we note that we have previously rejected attempts to circumvent the timeliness requirements of the PCRA by asserting prior counsel's ineffectiveness for failing timely to raise a claim. *See Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 367 (2011) ("it is well established that the fact that a petitioner's claims are couched in terms of ineffectiveness will not save an otherwise untimely petition from the application of the time restrictions of the PCRA."); *Commonwealth v. Crews,* 581 Pa. 45, 863 A.2d 498, 503 (2004); *Commonwealth v. Abu–Jamal,* 574 Pa. 724, 833 A.2d 719, 723 (2003); *Commonwealth v. Breakiron,* 566 Pa. 323, 781 A.2d 94, 97 (2001); *Beasley,* 559 Pa. 604, 741 A.2d 1258. As we have

explained, the nature of the constitutional violations alleged has no effect on the application of the PCRA time bar. *Commonwealth v. Wharton,* 584 Pa. 576, 886 A.2d 1120, 1126–27 (2005) (rejecting the claim that the time-bar should not apply to a second petition because the underlying claim involved a constitutional right, holding that "this is nothing more than a convoluted way of attempting to carve out an exception to the jurisdictional timeliness requirements of the PCRA for ineffective assistance of counsel claims"); *Commonwealth v. Murray,* 562 Pa. 1, 753 A.2d 201, 203 (2000). Rather, the only cognizable exceptions are set forth at Section 9545(b)(1).

■ Appellant advances the same arguments and relies on the same exceptions set forth in Section 9545(b)(1)(i) and (ii) with respect to Mr. Kruis. The basis of this claim is the map Appellant drew for police during their interrogation, and the copy of the map the police drew by hand. The police showed the copy of the map to Mr. Kruis, who used it to lead police to the victim's body. Before trial, the police-drawn map was lost, although the original map drawn by Appellant was preserved and admitted into evidence. Mr. Kruis testified for the Commonwealth at trial. On June 21, 2005, Appellant's investigator interviewed Mr. Kruis, who explained that when he first saw the map drawn by Appellant, he noticed it was different from the one the police showed him. Mr. Kruis drew another map for the investigator representing his recollection of the map police showed him, which, according to Appellant, differed from the map he provided to police. This claim was supported with an affidavit from the investigator because Mr. Kruis would not sign an affidavit and is now deceased.

Mr. Brown, who was apparently implicated as possibly being present in the victim's home on the night of her disappearance, was questioned by police and later testified for the Commonwealth at Appellant's trial. On June 30, 2005, Appellant's investigator interviewed Mr. Brown, who provided a statement that the police had met with him several times before the trial and he told them he did not believe Appellant was guilty. There were no police reports that disclosed the interviews with Mr. Brown. Appellant believes that the infor-

mation revealed by Mr. Brown falls within the exceptions of Section 9545(b)(1)(i) and (ii).

Mr. Kruis and Mr. Brown both provided their statements to Appellant's investigator in June 2005. Appellant has not addressed why he was unable to obtain these statements and present them at an earlier date with the exercise of due diligence. *See* 42 Pa.C.S. § 9545(b)(2). As he was required to file his claims within 60 days of when they could have been presented, and has not explained why he could not have presented these claims earlier, *i.e.*, during his first PCRA petition, they are untimely.[4]

We turn next to the claim the PCRA court found to be timely, but rejected on the merits. This claim is premised on the NAS Report's discussion of the "imprecision of microscopic hair analysis," which Appellant argues is a newly discovered fact that undermines the strength of the Commonwealth's evidence that the hairs found in his truck "matched" the victim's.[5]

At trial, the Commonwealth submitted evidence that police recovered from Appellant's vehicle a blanket with blond hairs covering it. *See Edmiston I*, 634 A.2d at 1086. The Commonwealth also introduced the testimony of an expert witness, Bruce Tackett, who testified that the hairs found in Appellant's truck exhibited the "same" microscopic characteristics as the hairs Mr. Tackett had taken from the victim's head. N.T. 7/6/1989 at 167. On cross-examination, Mr. Tackett testified that the match meant that the hairs from the truck had either come from the victim or from someone who had

4. Appellant raised several other claims in his Supplemental Petition which the PCRA Court also found were untimely. *See* PCRA Court Op. December 22, 2009, at 33. Although Appellant baldly asserts that these claims are timely, he has not identified which claims he is referring to other than characterizing them as those "related to the NAS Report." Appellant's Brief at 48. According to Appellant, all of his claims premised upon the NAS Report are timely. He has not developed this argument as it relates to each claim and, as such, has failed to carry his burden of demonstrating that these claims are timely.

5. Appellant provided the PCRA court with a prepublication copy of the NAS Report. The Report can be found at the National Academies Press website at http://www.nap.edu.

hair "identical" to hers. N.T. 7/6/1989 at 196–97. He characterized the possibility of someone having identical hair as remote. *Id.* at 197–98. During the penalty phase Mr. Tackett testified that it was very unlikely that the hairs taken from the truck could have coincidentally matched the victim's, N.T. 10/3/1989 at 88–89, and that it was most likely that the hairs came from the same source as the standard hairs he took from the victim's head. *Id.* at 87. The witness also explained that it was possible that it was a coincidental match, and that the hairs could have come from someone else. *Id.* at 87–88.

The NAS Report, published in February 2009, is entitled "Strengthening Forensic Science in the United States: A Path Forward" and was created to assess present and future resource needs of the forensic science community; to make recommendations for maximizing use of forensic technologies and techniques to solve crimes, investigate deaths and protect the public; to identify potential scientific advances that may assist law enforcement; to make recommendations for programs that will increase the number of qualified forensic scientists and medical examiners; to disseminate best practices and guidelines concerning the collection and analysis of forensic evidence; to examine the role of the forensic community in the homeland security mission; to examine interoperability of the Automated Fingerprint Information Systems; and to examine such additional issues pertaining to forensic science as needed. Chapter 5 of the NAS Report provided descriptions of some forensic science disciplines with a focus on the reliability and precision of results.

Of thirteen specific forensic science disciplines that the Report addressed in Chapter 5, Appellant relies on its discussion of hair analysis. In this regard the Report reviewed prior studies and articles to conclude that there was no scientific support for the use of microscopic hair analysis for individualization that is not accompanied by mitochondrial DNA analysis.[6] In his Supplemental Petition, Appellant ar-

6. Individualization is sometimes referred to as a conclusion that a biological specimen "matches" a particular individual or source. *See* Appellant's Exhibits to Supplemental Petition, NAS Report, at S-5.

gued that the NAS Report offered newly discovered facts to support his claim of actual innocence, thus relying on the timeliness exception of Section 9545(b)(1)(ii). He claimed that the newly discovered fact of the NAS Report shows that Mr. Tackett's testimony was false, misleading, and unreliable.[7]

The PCRA Court held that to the extent the NAS Report contained a specific examination of the scientific support for various methodologies of hair analysis, it qualified as new information under Section 9545(b)(1)(ii). In this regard, the PCRA court observed that the deficiencies and weaknesses of forensic science are nothing new, and commonly form the basis for attacks on expert testimony in the court room. What was new, in the PCRA court's view, was that these deficiencies have now been collected, investigated, and studied in a report bearing the imprimatur of the NAS. Because the NAS Report was published less than 60 days before Appellant filed his Supplemental Petition, the PCRA court held this claim was timely.[8]

The Commonwealth disputes the PCRA court's finding of timeliness under Section 9545(b)(1)(ii) by arguing that the information on which the NAS Report was based had been in existence in the public domain for years prior to being compiled in the Report and, therefore, with the exercise of due diligence could have been discovered by Appellant well before being included in the NAS Report in February 2009. The Commonwealth concludes that Appellant has therefore failed to prove the applicability of the timeliness exception set forth at Section 9545(b)(1)(ii).

7. Appellant also argued the applicability of the governmental interference exception, *see* 42 Pa.C.S. § 9545(b)(1)(i), which the PCRA court rejected, and Appellant has not argued to this Court.

8. The PCRA court, however, found that Appellant's claim failed on the merits because Mr. Tackett's testimony did not individualize the hair found in Appellant's truck to the victim, and was therefore not inconsistent with the NAS Report. Additionally, the PCRA court held that the newly discovered information in the NAS Report would be useful only for impeachment and, moreover, would not have changed the outcome of the trial. Because of our conclusion on timeliness, we do not address the PCRA court's analysis of the merits of this claim.

This Court has addressed the meaning of "facts" as that term is employed in Section 9545(b)(1)(ii) and held that, to constitute such "facts," the information may not be part of the public record. *See Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585 (2000). Similarly, we have held that a petitioner must allege and prove previously unknown "facts," not merely a "newly discovered or newly willing source for previously known facts." *Marshall*, 947 A.2d at 720 (citing *Commonwealth v. Johnson*, 580 Pa. 594, 863 A.2d 423, 427 (2004)). These principles have been applied when a petitioner has relied on a study to satisfy the time-bar exception of Section 9545(b)(1)(ii). *See Lark*, 746 A.2d at 588, n. 4 (concluding that because a particular study of the Philadelphia criminal justice system consisted of statistics which were public record, it could not be said that the statistics were unknown to the petitioner). *See also Commonwealth v. Whitney*, 572 Pa. 468, 817 A.2d 473, 478 (2003) (employing this analytical approach to reject a similar reliance on the same study).

In *Commonwealth v. Fisher*, 582 Pa. 276, 870 A.2d 864 (2005), the petitioner relied on the timeliness exception at Section 9545(b)(1)(ii) to raise a claim undermining the Commonwealth's expert trial testimony based in part on an affidavit from a retired FBI metallurgist. We reversed the PCRA court's determination that the petition fell within the Section 9545(b)(1)(ii) exception to the timeless requirement, holding that the claim based on the expert's affidavit was not timely because the expert had published his opinions in previous research that had been available and discoverable for more than the two prior years. *Id.* at 871.[9]

 Therefore, to constitute facts which were unknown to a petitioner and could not have been ascertained by the

---

**9.** The petitioner in *Fisher* also relied on a newspaper article describing a soon to be released study by the NAS that the petitioner claimed demonstrated that certain evidence against him was flawed. We held that to the extent the petitioner's claim was filed within sixty days of the when the information was reported, as required by 42 Pa.C.S. § 9545(b)(2), it did not provide a basis upon which he could predicate an untimely claim because the study did not support Appellant's contention that the evidence introduced against him was flawed.

exercise of due diligence, the information must not be of public record and must not be facts that were previously known but are now presented through a newly discovered source. The "fact" Appellant relies upon as newly discovered is not the publication of the NAS Report, but the analysis of the scientific principles supporting hair comparison analysis. His argument is that the Commonwealth's evidence, specifically the testimony of Mr. Tackett, is unreliable based on the information recited in the NAS Report. It is when the underlying information was available to Appellant in the public domain that we must examine.

In this case, the Commonwealth is correct that the facts compiled in the NAS Report were not new, and existed in various sources prior to the publication of that report. Specifically, the NAS Report refers to various studies and reports published in the public domain as early as 1974 and as recently as 2007. As such, the information relied upon by Appellant in the Report constitutes facts that were in the public domain and could have been discovered by Appellant through the exercise of due diligence prior to the filing of his April 20, 2009, Supplemental Petition. Therefore, Appellant's claim, premised on the information provided in the NAS Report, does not satisfy the exception of Section 9545(b)(1)(ii). As Appellant's Supplemental Petition failed to satisfy the exception to the PCRA's jurisdictional time limitations, the PCRA court was without jurisdiction to consider its merits.

Appellant also challenges the PCRA court's denial of his request for postconviction discovery in accord with Pa. R.Crim.P. 902(E), which provides as follows:

(1) Except as provided in paragraph (E)(2), no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances.

(2) On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause.

Appellant sought an order requesting documents from the state police crime laboratory related to the sufficiency and accuracy of Mr. Tackett's testing. As this case does not involve a first counseled petition, discovery is permitted only "upon leave of court after a showing of exceptional circumstances." Pa.R.Crim.P. 902(e)(1). Appellant argues that he has amply demonstrated exceptional circumstances to justify his request for discovery because he offered "considerable evidence of innocence that completely undermines the forensic testimony presented at trial, and suggests that Mr. Tackett's analysis did not comport with accepted scientific procedures." Appellant's Brief at 59. Additionally, Appellant asserts that the record demonstrates significant questions regarding the crime laboratory's oversight and the accuracy and integrity of its examiners.

The denial of a request for post-conviction discovery is reviewed for an abuse of discretion. *Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237, 272 (2008). Discovery in PCRA proceedings cannot be used as an excuse for engaging in a "fishing expedition." *Lark*, 746 A.2d at 591. All of Appellant's claims are untimely, and the documents he requested are relevant to the merits of his untimely claims. Moreover, Appellant has offered no argument except to say that his discovery requests are supported by the record. Under these circumstances, we cannot say that the trial court abused its discretion in declining to find exceptional circumstances to warrant discovery. Appellant is not entitled to relief on this claim.

We now turn to Appellant's motion for post-conviction DNA testing pursuant to 42 Pa.C.S. § 9543.1, in which he requested permission to conduct tests of the blood samples taken from inside his truck and the vaginal, oral, and rectal swabs taken from the victim. Section 9543.1, which governs post-conviction DNA testing requests and was effective on September 9, 2002, provides in relevant part:

(a) Motion.—

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

\*　　\*　　\*

(c) Requirements.—In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1) (i) specify the evidence to be tested;

(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

(iii) acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2) (i) assert the applicant's actual innocence of the offense for which the applicant was convicted; and

(ii) in a capital case:

(A) assert the applicant's actual innocence of the charged or uncharged conduct constituting an aggravating circumstance under section 9711(d) (relating to sentencing proce-

dure for murder of the first degree) if the applicant's exoneration of the conduct would result in vacating a sentence of death; or

(B) assert that the outcome of the DNA testing would establish a mitigating circumstance under section 9711(e)(7) if that mitigating circumstance was presented to the sentencing judge or jury and facts as to that issue were in dispute at the sentencing hearing.

(3) present a prima facie case demonstrating that the:

(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

(ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:

(A) the applicant's actual innocence of the offense for which the applicant was convicted;

(B) in a capital case, the applicant's actual innocence of the charged or uncharged conduct constituting an aggravating circumstance under section 9711(d) if the applicant's exoneration of the conduct would result in vacating a sentence of death; or

(C) in a capital case, a mitigating circumstance under section 9711(e)(7) under the circumstances set forth in subsection (c)(1)(iv).

(d) Order.—

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial, that the:

(i) requirements of subsection (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted;

(ii) in a capital case, would establish the applicant's actual innocence of the charged or uncharged conduct constituting an aggravating circumstance under section 9711(d) if the applicant's exoneration of the conduct would result in vacating a sentence of death; or

(iii) in a capital case, would establish a mitigating circumstance under section 9711(e)(7) under the circumstances set forth in subsection (c)(1)(iv).

* * *

(f) Posttesting procedures.—

(1) After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the 60–day period beginning on the date on which the applicant is notified of the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief).

(2) Upon receipt of a petition filed under paragraph (1), the court shall consider the petition along with any answer filed by the Commonwealth and shall conduct a hearing thereon.

(3) In any hearing on a petition for postconviction relief filed under paragraph (1), the court shall determine whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi).

42 Pa.C.S. § 9543.1.

Addressing Appellant's motion for DNA testing and the Commonwealth's answer thereto, the PCRA court first reject-

ed the Commonwealth's argument that Appellant's petition was untimely under Section 9543.1(d)(1)(iii) as follows:

> Of course, no one but Defendant and his counsel know with any certainty whether or not the motion is filed merely for the purposes of delaying execution of sentence or administration of justice.

> However, given the advances in technology, the nature of the issues raised by the defense in companion Post–Conviction Relief Act motions, the absence of any Commonwealth claim of prejudice, and, in particular, recognizing that this is a capital case requiring enhanced focus on the reliability and validity of the adjudicatory process, we find the motion to be timely.

PCRA Ct. Op., 10/2/09, at 6.

Turning to the merits of Appellant's request, the PCRA court held that it was bound to follow the then-governing Superior Court precedent of *Commonwealth v. Young*, 873 A.2d 720 (Pa.Super.2005) (holding that the petitioner could not meet the *prima facie* requirements of Section 9543.1 for DNA testing because the validity of his confession to the murder had been finally litigated) and *Commonwealth v. Wright*, 935 A.2d 542 (Pa.Super.2007) (relying on *Young* to conclude that the petitioner was precluded by his finally litigated confession from proving his actual innocence and therefore could not obtain post-conviction DNA testing). Applying *Young* and *Wright*, the PCRA court observed that the voluntariness of Appellant's confession was finally litigated, and, therefore, under the applicable precedent, Appellant was barred from presenting a *prima facie* case of actual innocence in accord with Section 9543.1(c)(3).

Following the PCRA court's order, we overruled *Young*, reversed the Superior Court decision in *Wright*, and held that there is no prohibition in Section 9543.1 which would preclude a convicted individual who has confessed to a crime, and who otherwise meets all of the statutory requirements, from obtaining DNA testing, merely because of the existence of the confession. *Wright*, 14 A.3d at 814. Relying on our decision

in *Wright,* Appellant argues that he is not precluded by his confession from obtaining the DNA testing he seeks, and asserts that he otherwise meets all of the requirements of Section 9543.1.

The Commonwealth acknowledges that the legal support for the PCRA court's denial of Appellant's motion for DNA testing was invalidated by this Court's decision in *Wright,* and concedes that Appellant is not precluded from obtaining DNA testing by virtue of his confession. Rather, the Commonwealth offers an alternative basis to affirm the PCRA court's denial of testing premised on its view that Appellant's request is untimely under Section 9543.1(d)(1)(iii), which requires the PCRA court to determine that a petitioner's request for DNA testing is "made in a timely manner," to demonstrate "actual innocence," and not "to delay the execution of sentence or administration of justice." 42 Pa.C.S. § 9543.1(d)(1)(iii).

The Commonwealth argues that the PCRA court's finding of timeliness relied on a number of factors unrelated to the statutory analysis. Moreover, the Commonwealth argues that the facts do not support the PCRA court's conclusion that Appellant's petition was timely, in that Section 9543.1 was enacted in 2002, and Appellant nevertheless waited until November 2008 to file his motion for DNA testing. The Commonwealth sees this gap as irrefutable indicia of Appellant's attempt to delay execution and thwart the administration of justice, and argues that the PCRA court therefore erred in finding the request for DNA testing timely.

Although the Postconviction DNA Testing Act, 42 Pa.C.S. § 9543.1(d)(1)(iii), directs that the PCRA court shall order DNA testing if it finds that the motion is made in a timely manner and for the purpose of demonstrating actual innocence rather than to delay the execution of the sentence or the administration of justice, it does not otherwise define timeliness. Other than a Superior Court panel's observation that "Section 9543.1 places no time limits on motions for DNA testing," *Commonwealth v. Scarborough,* 9 A.3d 206, 211 (Pa.Super.2010), Pennsylvania courts have not otherwise construed the requirement of timeliness in this context. *See*

*Commonwealth v. Brooks,* 875 A.2d 1141, 1146 (Pa.Super.2005) (noting that the statute does not define "timely manner," but ultimately deciding the appeal on other grounds). Consequently, the timeliness requirement of a motion for post-conviction DNA testing is an issue of first impression.

Examining the statutory language, Section 9543.1(d)(1) directs the PCRA court faced with a post-conviction request for DNA testing to order the testing requested if, after reviewing the record of the applicant's trial, it determines that (1) the applicant has satisfied the requirements of the motion; (2) that the evidence to be tested has been subject to an adequate chain of custody; and (3) that the motion is made in a timely manner, for the purpose of demonstrating actual innocence, and not to delay the execution of the sentence or administration of justice. 42 Pa.C.S. § 9543.1(d)(1). It is the last of these three determinations that is implicated by the Commonwealth's argument in this case.

The applicant, as the moving party, bears the burden of showing that the test is requested for the purpose of demonstrating actual innocence and not for delay. Here, although the trial court purported to find that the motion was timely, it observed that it could not know with certainty whether the motion was filed merely for the purpose of delay. The PCRA court identified other factors to support its finding of timeliness, specifically referring to advances in technology, the nature of the issues raised in the serial PCRA petition, no claim of prejudice by the Commonwealth, and the sentence of death, but did not explain how these factors are relevant to an assessment of timeliness under Section 9543.1(d)(1)(iii).

Respectfully, we agree with the Commonwealth that the PCRA court's declaration that it could not know for sure what Appellant's incentive was for filing the petition for DNA testing demonstrates a misperception of the court's obligation to render a specific determination in this respect. Timing determinations requiring examination of case-specific factors are not particularly unusual or difficult and, in any event, as the Commonwealth observes, any difficulty in the applicant's proof "does not relieve the defense of its burden or the PCRA

court of its duty." Commonwealth Brief at 51. As difficult as it may be, PCRA courts are specifically charged with making this determination.

Although the PCRA court did not make the requisite finding of timeliness, we see no need to remand for the court to do so because, as explained below, our own review of the record and circumstances surrounding Appellant's post-conviction DNA testing request leads to the conclusion that this motion was untimely as a matter of law and was forwarded only to delay further the execution of the sentence. Notably, at the time of trial, Appellant indicated that he was satisfied with the DNA testing that had been conducted, and declined further testing. Following conviction, as noted, the postconviction DNA testing provision was enacted on September 8, 2002. Thereafter, Appellant's review as of right under the PCRA concluded in 2004 with our decision in *Edmiston II*, 578 Pa. 284, 851 A.2d 883, without him seeking DNA testing. Moreover, he did not seek such testing as part of his second PCRA petition (which caused his federal *habeas corpus* petition to be held in stasis, thereby causing further delay), or as part of the amendment or supplement to that petition. It was not until after his second PCRA petition was nearing completion that Appellant finally sought DNA testing.

Appellant has known of the existence of the physical evidence he now seeks to test since his trial over twenty years ago. From that time to the present he has been represented by counsel, who knew of the statute, the technology, and the evidence, and who were vigorously pursuing post-conviction relief on his behalf. Under such circumstances, courts should exercise a healthy skepticism when faced with requests for DNA testing.

This is especially true when, as here, careful examination of the record reveals that Appellant is not a likely candidate to be exonerated by DNA testing. Even though our holding in *Wright*, 609 Pa. 22, 14 A.3d 798, renders Appellant's multiple inculpatory statements no longer a *per se* bar to DNA testing, those admissions are still part of a mass of record evidence

that, the Commonwealth persuasively argues, refutes any notion of Appellant's actual innocence. Appellant's confession was not made in isolation, but included an admission of rape and murder in a case where police had not yet found the victim's body, and Appellant drew for the police a map directing them to the exact location in a remote and isolated rural area, where the corpse of the victim was found. Appellant told police "you will find a dead raped little girl," further advising police they would find the victim's body off a certain road and covered with branches. When police used the map provided by Appellant, with the assistance of Mr. Kruis, they found the victim's body at the location specified by Appellant. Police also found the victim's shorts in Appellant's truck; the hairs in Appellant's truck were microscopically similar to the victim's own hair; the tire tread and wear pattern near the child's body were consistent with the tires on Appellant's truck; and Appellant's claim that the blood in his truck was his own and resulted from a cut on his arm was rebutted by prison officials who admitted Appellant to prison and noted no significant cuts on his body.

Given this evidence, it is not surprising Appellant declined DNA testing at the time of trial, following the inability of the preliminary, pre-trial DNA tests to identify or inculpate Appellant; a decision to seek further testing, of course, could have sealed Appellant's fate. That fact, in turn, is probative of the delay and purpose of Appellant's belated request for DNA testing, forwarded only as his serial PCRA petition was approaching conclusion. As Mr. Justice Eakin, writing presciently for the Court, has noted:

> [T]he statute limits post-trial testing for very salient reasons: If post-trial testing were routinely available, few would seek pre-trial testing; it would behoove counsel to go to trial without testing, then seek DNA testing if convicted, there being nothing but an up-side to a convicted client. DNA testing that is available cannot become after-discovered evidence, and cannot be treated as a second chance lottery ticket.

*Commonwealth v. Williams,* 587 Pa. 304, 899 A.2d 1060, 1065 n. 4 (2006). This observation is just as true when examining the timing of DNA testing requests under the PCRA.

The PCRA court also spoke of "advances in technology," but, as the Commonwealth notes, the statute does not make advances in technology an excuse for failing timely to request DNA testing. The statute recognized that the testing available at the time of its enactment was of sufficient reliability that defendants could seek DNA testing, in cases where good faith claims of innocence were timely raised. Appellant's guilty status has not changed since his 1989 conviction; advances in technology allegedly occurring after that date do not explain why he, if truly innocent, did not seek immediate testing, or, at the very least, testing available as technology improved during the intervening years, rather than languishing on death row, all the while being supposedly innocent.

The lower court's reference to the nature of the issues raised in Appellant's PCRA petition likewise does not excuse a failure to act timely to seek DNA testing. The DNA testing statute does not make the nature of the issues raised relevant to timeliness; nor does the statute include as relevant factors the capital nature of the PCRA petition or prejudice to the Commonwealth.

Taking into consideration the strength of the evidence proffered against Appellant at trial, as the DNA testing provision explicitly requires, Appellant's deliberate decision at the time of trial not to seek further scientific testing, his counsel's apparent decision not to seek DNA testing throughout these lengthy post-conviction proceedings, and the belated timing of the current claim, it cannot reasonably be concluded that his DNA testing motion was made "in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice."

We therefore affirm the order of the PCRA court denying relief on the claims raised in Appellant's Second PCRA Petition and related filings, as well as his request for post-

conviction DNA testing. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor. 42 Pa.C.S. § 9711(i).

Justice Orie MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE and MESSRS. Justice EAKIN and McCAFFERY join the opinion.

Justice SAYLOR joins the opinion, except for the treatment of Appellant's motion for post-conviction DNA testing, as to which he concurs in the result.

Justice TODD files a concurring opinion.

## CONCURRING OPINION

Justice TODD.

I join the Majority Opinion in all but one respect. I cannot agree with the majority that Appellant's PCRA claim, premised on the February 2009 Report (the "Report") from the National Academy of Sciences (the "Academy"), was untimely.

As the majority discusses, Appellant relies on the Report to support a challenge to the expert hair analysis testimony offered at trial, which concluded that hair found in Appellant's truck came from the victim. In particular, Appellant relies on the Report's section entitled "Analysis of Hair Evidence," and the following conclusions therein:

— The Academy "found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA;"

— "No scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population;" and

— "There appear to be no uniform standards on the number of features on which hairs must agree before an examiner may declare a 'match'."

Report at 5–25 to 5–26 (quoted in Appellant's Brief at 23). Nevertheless, the majority concludes that these "facts" in the Report "were not new, and existed in various sources prior to the publication" of the Report, and thus "were in the public domain and could have been discovered by Appellant through the exercise of due diligence" prior to the filing of his PCRA petition. Majority Opinion at 569, 65 A.3d at 352–53. Accordingly, the majority rejects the claim as untimely under the PCRA. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii) (to rely on timeliness exception, petitioner must prove that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence"). I cannot agree.

The Academy is unlike other scientific bodies. It was chartered by the federal government during the Civil War, with a mandate to advise the government on science and technical matters. *See* 36 U.S.C. § 150301, Historical Notes; *id.* § 150303 ("On request of the United States Government, the [Academy] shall investigate, examine, experiment, and report on any subject of science or art."). According to the Academy, it is a society of distinguished scholars and, since 1863, has been "charged with providing independent, objective advice to the nation on matters related to science and technology." [1] It is arguably the Nation's most prestigious scientific organization.

In November 2005, reportedly in the wake of several high profile mistaken prosecutions relying on forensics, Congress authorized the Academy to conduct a study on the state of forensic science, resulting in its February 2009 Report. *See* Report at S–1. In preparation for the Report, the Academy heard testimony from experts in government, law enforcement, law, academia, and elsewhere; reviewed published materials, studies, and reports related to forensic science; and conducted independent research. Report at S–2.

Specifically with regard to its analysis of hair evidence, the Report discusses studies from the *Journal of Forensic Sci-*

1. Mission Statement of the National Academy of Sciences, http://www.nasonline.org/about-nas/mission/ (last visited April 18, 2013).

*ences* and other publications.[2] *See* Report at 5–22 to 5–26. However, with regard to its conclusions cited above, and in particular its sweeping statement that it "found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA", the Report cites no sources. Thus, these are not merely the regurgitated conclusions from previously published studies, or from a prior Academy report, which Appellant could have uncovered previously with some diligence.

Rather, these are the novel conclusions concerning the deficiencies in the analysis of hair evidence from the leading science advisory body in the Nation, after being charged under federal law to make these very assessments, and following its own investigation and research. No amount of prior diligence by Appellant, no amount of combing through the *Journal of Forensic Sciences, Forensic Science Review, Forensic Science Communications,* or any of the other studies or publications the Academy reviewed from the last 40 years, could have produced such findings. Such findings bear the unique imprimatur of the Academy.

In PCRA terms, these "facts"—the conclusions from the Academy—did not exist before the publication of the Academy's Report. For this reason, this case differs from those cited by the majority. *See Commonwealth v. Fisher,* 582 Pa. 276, 870 A.2d 864 (2005) (rejecting affidavit from FBI expert challenging bullet analysis as it reiterated his previously published opinions)[3]; *Commonwealth v. Lark,* 560 Pa. 487, 746

---

**2.** Notably, none of the discussions in its section addressing hair evidence reference its own prior findings or those of its related organs— the National Academy of Engineering, the Institute of Medicine, or the National Research Council.

**3.** Indeed, our decision in *Fisher* may be read to *support* the timeliness of Appellant's claim herein. Therein, we also addressed the petitioner's reliance on an Academy article, entitled "Forensic Analysis: Weighing Bullet Lead Evidence," and essentially agreed with the PCRA court's threshold determination that this information was not previously available. However, contrary to the petitioner's assertions, we concluded that the article suggested the bullet analysis used in the petitioner's case *was* reasonably accurate. *Fisher,* 582 Pa. at 287, 870 A.2d at 870. Thus, we determined that the article did not provide a basis on which

A.2d 585 (2000) (rejecting statistical analysis in law review article of race disparity in death penalty system as it was based on statistical data in the public record); *Commonwealth v. Whitney*, 572 Pa. 468, 476, 817 A.2d 473, 478 (2003) (same). Accordingly, with respect to Appellant's PCRA claim based on the Report, I would find Appellant's claim to be timely filed.[4]

Nevertheless, I would reject the claim, as I agree with the PCRA court that introduction of the Academy's conclusions—while damning to the hair analysis testimony offered against Appellant at trial—would be in the nature of impeachment evidence and, given the overwhelming character of the other evidence offered against Appellant, would not have altered the outcome of his trial. *See* Trial Court Opinion, 4/26/10, at 11–12. Thus, I would reject Appellant's PCRA claim on this alternative basis. *See Commonwealth v. D'Amato*, 579 Pa. 490, 519, 856 A.2d 806, 823–24 (2004) (for PCRA claim to qualify under previously-unavailable-evidence provision in 42 Pa.C.S.A. § 9543(a)(2)(vi), evidence, *inter alia*, must not be used solely for impeachment, and must compel a different verdict). Accordingly, I concur in the majority's rejection of this claim.[5]

---

the petitioner could predicate a timeliness exception because it did not, on the merits, support his claim. *Id.*

4. The Commonwealth argues that Appellant's presentation of this claim was untimely because Appellant failed to prove that he did not learn of the Report prior to its publication, noting that the version of the Report Appellant attached to his PCRA petition was labeled "PREPUB-LICATION COPY," indicating it may have been discoverable prior to publication. Commonwealth's Brief at 34. However, in his petition, Appellant asserts that the pre-publication copy is the version issued by the Academy on February 18, 2009, and his PCRA petition was filed within 60 days of that date. Supplemental Petition for Post–Conviction Relief at 1; *see* 42 Pa.C.S.A. § 9545(b)(2) ("Any petition invoking [a timeliness] exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented."). Thus, I conclude the claim based on the Report was timely.

5. To the degree Appellant's request for post-conviction discovery was based in part on this claim, I join the majority's conclusion that the trial court's decision to deny discovery should not be disturbed. *See* Majority Opinion at 571, 65 A.3d at 353. I concur not because, as the majority concludes, the claim was untimely, but because, in my view, the claim lacked sufficient merit to support a showing of exceptional circumstances justifying discovery.