J-E02007-15

2015 PA Super 272

IN RE:  JOHN MARSHALL PAYNE III      :      IN THE SUPERIOR COURT OF
                                     :            PENNSYLVANIA
                                     :
                                     :
APPEAL OF:  COMMONWEALTH OF          :
PENNSYLVANIA                         :      No. 1113 MDA 2013

Appeal from the Order Entered May 22, 2013
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-MD-1000291-1986

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., PANELLA, J., DONOHUE, J.,
         SHOGAN, J., ALLEN, J., LAZARUS, J., MUNDY, J., and STABILE, J.

DISSENTING OPINION BY GANTMAN, P.J.:      **FILED DECEMBER 29, 2015**


I agree with the dissenting opinion which holds that Mr. Payne failed to set forth a *prima facie* case of actual innocence under the facts of this case. I write separately to highlight that Mr. Payne also failed to establish the statutory timeliness of his petition as mandated by the DNA statute at 42 Pa.C.S.A. § 9543.1(d)(1)(iii) and our Supreme Court's decision in **Commonwealth v. Edmiston**, 619 Pa. 549, 65 A.3d 339 (2013), *cert. denied*, ___ U.S. ___, 134 S.Ct. 639, 187 L.Ed.2d 423 (2013). Therefore, I respectfully dissent on this ground as well.

The relevant facts and procedural history of this case are as follows. Around 9:00 p.m. on December 17, 1981, family members of Victim found Victim dead in her bed. Victim was ninety years' old at that time. Victim's family members discovered Victim with the covers pulled up over her body

and a pillow over her head. When family members removed the covers and pillow, they saw Victim's head and face were covered with blood. Family members noticed several objects in Victim's bedroom had been moved, closet doors and drawers were pulled open and appeared to have been rummaged through, and Victim's jewelry was strewn around the room. Victim usually slept with the telephone on her bed so she could quickly call her family in case of an emergency. When family members discovered Victim, the telephone was not in its usual place on the bed but on the nightstand next to Victim's bed. Victim's glasses were also not in their usual spot. Additionally, family members saw a broken window downstairs. According to Dr. Joan W. Gibble (pathologist), Victim suffered multiple blows to her head with a firm instrument; the blow to the right side of Victim's head caused her death. Dr. Gibble opined Victim's injuries were consistent with being stuck with a telephone.

Officer Kenneth Miller and Detective Robert Harman (among others) responded to the crime scene. Officer Miller also noticed the drawers in Victim's bedroom appeared to have been ransacked, closet doors were open, paper was strewn about, and a window downstairs had been broken. Officer Miller and another sergeant processed the items they thought might contain fingerprints. Officer Miller used a special evidence vacuum cleaner; police retain as evidence anything collected in the vacuum cleaner and process the evidence for fingerprints. Importantly, police sent all physical evidence

collected from the crime scene to the Federal Bureau of Investigation ("FBI") for testing and examination. No physical evidence found at the crime scene produced a suspect.

In March 1983, Officer Daniel Garber was investigating an unrelated case. Mr. Payne was assisting Officer Garber with his investigation. During a meeting on March 25, 1983, Mr. Payne mentioned that a state trooper was accusing him of beating a 90-year-old woman to death with a telephone. Officer Garber related Mr. Payne's comment to Detective Harman. Notably, prior to 1983, police had not disclosed the suspicion that a telephone was the potential murder weapon in Victim's case.

In August 1983, police received further information from Deborah Wallick about Victim's murder. Ms. Wallick informed police Mr. Payne had told her that he and two others went to rob Victim's house on the night in question. Mr. Payne heard a noise from the bedroom and, when he went to the bedroom, he saw Victim being beaten with a telephone. Mr. Payne told Ms. Wallick he ran from the crime scene and thought Victim was dead. Ms. Wallick said Danny Everett was also involved in the crimes.

Sonny Olgesby, an inmate in York County prison, supplied police with more information about Victim's case. Mr. Olgesby informed Detective Harman that on December 24, 1985, Mr. Payne had told Mr. Olgesby about a lady who was murdered and asked Mr. Olgesby what Mr. Payne could do to avoid conviction. Mr. Payne then admitted his involvement in the crimes.

Mr. Payne said he needed money, so he, his girlfriend Melody, and a friend Danny (last name Edwards or Everett, nicknamed "Dago") decided to rob Victim. Mr. Payne admitted he beat Victim to death.

The Commonwealth subsequently charged Mr. Payne with murder and related offenses. Several days before Mr. Payne's jury trial was to begin, Christopher Gibson, an inmate in York County prison, told police he had additional information about Victim's case. Mr. Gibson related that on August 15, 1986, at approximately 7:30 p.m., Mr. Gibson was in the prison law library when Mr. Payne approached him and asked what Mr. Gibson thought about his case and about making it look like Victim's grandson had committed the murder. During this conversation, Mr. Payne disclosed that he and two others (one person named Danny and the other possibly named Rick) committed the murder, but Mr. Payne was confident the Commonwealth lacked sufficient evidence to prove his guilt. Mr. Payne stated he did not plan to kill Victim, as he believed no one was home on the night of the robbery. Mr. Payne admitted he struck Victim with a telephone, but he just thought she was "knocked out." Mr. Payne also disclosed he broke a window in Victim's house to gain entry. Additionally, Mr. Gibson revealed that Mr. Payne previously asked Mr. Gibson if he knew anyone who would be willing to say Mr. Payne had worked for him in December 1981 or January 1982, so Mr. Payne could prove he was working at that time and had a source of income.

Mr. Payne proceeded to a jury trial on August 20, 1986. The Commonwealth presented testimony/evidence from, *inter alia*, Victim's family members, Dr. Gibble, the investigating police officers/detectives, Ms. Wallick, Mr. Olgesby, and Mr. Gibson. Officer Miller and Detective Harman testified about their roles and actions in the investigation of Victim's case. Both officers testified that all physical evidence collected at the crime scene was submitted to the FBI for testing and examination; and **no physical evidence connected Mr. Payne to the crimes**.[1] Ms. Wallick, Mr. Olgesby, and Mr. Gibson each testified as to Mr. Payne's respective admissions of guilt. Defense counsel thoroughly and vigorously cross-examined these three witnesses. During his cross-examination of Ms. Wallick, defense counsel established Ms. Wallick was a heavy LSD drug user at the time she approached police with Mr. Payne's confession, which sometimes interfered with her perception. Defense counsel also elicited testimony from Ms. Wallick about her previous conviction for hindering apprehension or prosecution.

During cross-examination of Mr. Olgesby, defense counsel elicited testimony that Mr. Olgesby was facing the death penalty in an unrelated homicide case; Mr. Olgesby had negotiated a plea deal with the Commonwealth in which he could plead guilty to third-degree murder (and avoid the death penalty), in exchange for his testimony against two

---

[1] Detective Harman also testified that no physical evidence connected Daniel Everett to the crimes.

individuals involved in his own case and for his testimony against Mr. Payne. During cross-examination of Mr. Gibson, defense counsel attacked the witness' credibility by establishing Mr. Gibson had prior convictions for theft and burglary. Mr. Gibson also conceded he had negotiated a plea deal with the Commonwealth in which Mr. Gibson could plead guilty to theft (reduced from a robbery charge) and receive a county sentence in exchange for his testimony against Mr. Payne. Following Mr. Gibson's testimony, the Commonwealth rested its case.

In his defense, Mr. Payne presented testimony from several witnesses to refute the testimony of Ms. Wallick, Mr. Olgesby, and Mr. Gibson. Mr. Payne also presented testimony from Melody Codora (Mr. Payne's girlfriend at the time of the crimes) and Daniel Everett, whom the Commonwealth witnesses had mentioned as Mr. Payne's possible cohorts. Both witnesses denied their participation in the crimes. Mr. Payne also testified in his own defense. Mr. Payne maintained he had no involvement in the crimes charged and was not present at the crime scene. Mr. Payne also denied having made any admissions/confessions to Ms. Wallick, Mr. Olgesby, or Mr. Gibson.

On August 22, 1986, the jury convicted Mr. Payne of second-degree murder, burglary, aggravated assault, and criminal conspiracy.[2] On March 23, 1987, the court sentenced Mr. Payne to life imprisonment for the felony

---

[2] The jury acquitted Mr. Payne of first-degree murder.

murder conviction; the court imposed consecutive sentences of two to four years' imprisonment each for the burglary and conspiracy convictions.[3] Additionally, the court sentenced Mr. Payne on an unrelated robbery conviction to two to four years' imprisonment, consecutive to his sentence for second-degree murder but concurrent to his sentences for burglary and conspiracy. This Court affirmed Mr. Payne's judgment of sentence on February 29, 1988, and our Supreme Court denied allowance of appeal on January 23, 1991. **See Commonwealth v. Payne**, 541 A.2d 1153 (Pa.Super. 1988).

On June 7, 1991, Mr. Payne filed his first petition under the Post Conviction Relief Act ("PCRA");[4] Mr. Payne expressly established his intent to proceed *pro se*. In his PCRA petition, Mr. Payne asserted, *inter alia*, prior counsel was ineffective, Mr. Payne's sentence was illegal, and the Commonwealth committed gross prosecutorial misconduct by withholding exculpatory evidence. As to this last claim, Mr. Payne specifically alleged the Commonwealth had submitted for testing certain physical evidence found at the crime scene, but the Commonwealth withheld this evidence from Mr. Payne and trial counsel. On June 25, 1991, Mr. Payne filed a *pro se* motion for production of documents requesting, *inter alia*, a copy of the FBI report(s) used during the investigation of his crimes. On July 30, 1991, Mr.

---

[3] The aggravated assault conviction merged with felony murder.

[4] 42 Pa.C.S.A. §§ 9541-9546.

Payne filed a consolidated motion for discovery and a request for an evidentiary hearing again asserting his previous request for the production of documents. On September 9, 1991, the court entered an order, *inter alia*, scheduling an evidentiary hearing for October 1, 1991, and directing the Commonwealth to produce to Mr. Payne the results of the processing and tests done by the police or FBI. The court also granted Mr. Payne's request to proceed *pro se*.

The court held a PCRA hearing on October 1, 1991. Importantly, at the very beginning of the hearing, the Commonwealth stated on the record it had fully complied with the court's September 9, 1991 order and supplied Mr. Payne with the FBI reports at issue. Mr. Payne did not dispute the Commonwealth's representation. During the hearing, Mr. Payne advanced his challenges pertaining to the ineffective assistance of trial counsel. Mr. Payne did not offer any argument at the hearing regarding his prior claim that the Commonwealth withheld exculpatory evidence. Similarly, in his post-hearing brief, Mr. Payne argued all issues presented in his PCRA petition, except for his earlier claim that the Commonwealth withheld exculpatory evidence, which Mr. Payne abandoned.

On June 26, 1992, the PCRA court denied relief. In its supporting opinion, the court expressly stated:

> [Mr. Payne's] allegation that exculpatory evidence was
> withheld from him in the form of FBI reports is…without
> merit. Testimony at the PCRA hearing indicated that all
> FBI information was in the possession of [Mr. Payne]. No

> further mention of this information was made in [Mr. Payne's] brief, leading this [c]ourt to the conclusion that the allegation of withholding exculpatory evidence is without merit.

(PCRA Court Opinion, filed June 26, 1992, at 29) (internal citation omitted).

On July 7, 1992, Mr. Payne timely filed a notice of appeal. Mr. Payne did not mention on appeal any claim that the Commonwealth withheld exculpatory evidence. On April 30, 1993, this Court affirmed Mr. Payne's conviction for second-degree murder but reversed the conspiracy conviction because the relevant statute of limitations had already run when the Commonwealth charged Mr. Payne with that crime. Additionally, this Court vacated Mr. Payne's burglary sentence, where burglary was the predicate offense for the second-degree murder conviction, and remanded the case for the court to modify Mr. Payne's sentence accordingly. On July 5, 1994, the trial court vacated Mr. Payne's sentences for conspiracy and burglary.

Over twenty years after Mr. Payne first received the FBI documents, on June 14, 2012, Mr. Payne filed his current petition for DNA testing.[5] In his petition, Mr. Payne sought DNA testing of the following items recovered from the crime scene: (1) brown head hairs found on Victim's nightgown and bedsheet (designated Q8 and Q11); (2) human blood (designated Q1, Q7-Q11, Q13-Q15, Q17-Q19); and (3) a brown pubic hair (designated Q16).

---

[5] Mr. Payne alleges he originally filed his request for DNA testing on February 9, 2012, but the court misplaced it or failed to file it. The approximate four-month difference in the filing date is immaterial to my analysis.

Mr. Payne maintained DNA testing was not available at the time of his trial and current DNA testing will reveal the absence of Mr. Payne's DNA on the evidence sought to be tested. Mr. Payne claimed the absence of his DNA would prove his actual innocence of the crimes charged.

Notably, Mr. Payne alleged in his petition he had no idea such potential "exculpatory evidence" existed. Mr. Payne stated: "For the first time (ever) [Mr. Payne] was made aware that this important new evidence does exist and is preserved and is available for DNA testing." (Petition for DNA testing, filed June 14, 2012, at 12, ¶ 19). Mr. Payne further claimed he "was just (for the very first time)—provided the proof that these exhibits/specimens Q8, Q11, and Q16, ever existed." (**Id.**) Mr. Payne alleged he received this information from the FBI (mailed to his attorney) on January 8, 2012. Mr. Payne continued: "I want to emphasize that (at no time previous to this) was I aware that the evidence/specimens Q8, Q11, Q16, ever existed. Only when the FEDERAL BUREAU OF INVESTIGATION, provided this information was [Mr. Payne] alerted to these specimens that existed." (**Id.** at 13, ¶ 19) (emphasis in original). Mr. Payne attached to his petition a letter from the FBI dated December 30, 2011, addressed to Mr. Payne (c/o Attorney Enid Harris) informing Mr. Payne the FBI was providing him with 110 pages from the FBI file regarding Victim's murder, pursuant to the Freedom of Information/Privacy Act. The attached FBI file contains letters from the police dated December 20, 1981, and December 24, 1981, requesting

testing and examination of physical evidence recovered from the crime scene. The attached FBI file also contains the FBI's analyses of the physical evidence by documents dated December 21, 1981, December 30, 1981, February 18, 1982, and January 24, 1983.

The court appointed counsel to represent Mr. Payne on January 3, 2013. On April 19, 2013, the court held a hearing on Mr. Payne's request for DNA testing. Mr. Payne testified at the hearing that he did not receive the FBI file until December 2011. Mr. Payne claimed the results of DNA testing would establish his actual innocence. Mr. Payne also asserted that performance of DNA testing will give the Commonwealth an opportunity to discover the "true" killer by comparing the DNA tested to national databases.

The Commonwealth argued DNA testing would not establish Mr. Payne's actual innocence because police officers conceded at Mr. Payne's jury trial that no physical evidence connected him to the crimes; and the jury convicted Mr. Payne in the absence of physical evidence.

On May 23, 2013, the PCRA court granted Mr. Payne's request for DNA testing, deciding Mr. Payne had presented a *prima facie* case of actual innocence. Significantly, the PCRA court did not address the timeliness of Mr. Payne's petition. The Commonwealth timely filed a notice of appeal on June 18, 2013. On June 19, 2013, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which the Commonwealth timely filed on July 8, 2013.

On October 3, 2014, a panel of this Court affirmed the PCRA court's order granting Mr. Payne's request for DNA testing, with one dissent. On October 17, 2014, the Commonwealth filed a petition for *en banc* review, which this Court granted.

To begin, our standard of review in this case is as follows:

> Generally, the trial court's application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law. When reviewing an order [granting or] denying a motion for post-conviction DNA testing, this Court determines whether the movant satisfied the statutory requirements listed in Section 9543.1. We can affirm the court's decision if there is any basis to support it, even if we rely on different grounds to affirm.

***Commonwealth v. Williams***, 35 A.3d 44, 47 (Pa.Super. 2011), *appeal denied*, 616 Pa. 467, 50 A.3d 121 (2012) (internal citations omitted).

Requests for post-conviction DNA testing are governed by statute at 42 Pa.C.S.A. § 9543.1, which provides in pertinent part:

**§ 9543.1. Postconviction DNA testing**

**(a) Motion.–**

(1)  An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2)  The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of

the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

**(b) Notice to the Commonwealth.**—

(1) Upon receipt of a motion under subsection (a), the court shall notify the Commonwealth and shall afford the Commonwealth an opportunity to respond to the motion.

(2) Upon receipt of a motion under subsection (a) or notice of the motion, as applicable, the Commonwealth and the court shall take the steps reasonably necessary to ensure that any remaining biological material in the possession of the Commonwealth or the court is preserved pending the completion of the proceedings under this section.

**(c) Requirements.**—In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1)(i) specify the evidence to be tested;

(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

(iii) acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2)(i) assert the applicant's actual innocence of the offense for which the applicant was convicted; and

* * *

(3) present a *prima facie* case demonstrating that the:

(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

(ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:

(A) the applicant's actual innocence of the offense for which the applicant was convicted;

* * *

**(d) Order.—**

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process **upon a determination, after review of the record of the applicant's trial, that the:**

(i) requirements of subsection (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) **motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.**

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted;

\* \* \*

**(f) Posttesting procedures.—**

(1) After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the 60-day period beginning on the date on which the applicant is notified of the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief).

(2) Upon receipt of a petition filed under paragraph (1), the court shall consider the petition along with any answer filed by the Commonwealth and shall conduct a hearing thereon.

(3) In any hearing on a petition for postconviction relief filed under paragraph (1), the court shall determine whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi).

\* \* \*

42 Pa.C.S.A. § 9543.1 (emphasis added).

Thus, under Section 9543.1(a):

The statute sets forth several threshold requirements to obtain DNA testing: (1) the evidence specified must be available for testing on the date of the motion; (2) if the evidence was discovered prior to the applicant's conviction, it was not already DNA tested because (a) technology for testing did not exist at the time of the applicant's trial; (b) the applicant's counsel did not request testing in a case that went to verdict before January 1, 1995; or (c) counsel sought funds from the court to pay for the testing because

his client was indigent, and the court refused the request despite the client's indigency.

**Williams, supra** at 49 (citing 42 Pa.C.S.A. § 9543.1(a)(2)).

Additionally:

> The text of the statute set forth in Section 9543.1(c)(3) and reinforced in Section 9543.1(d)(2) requires the applicant to demonstrate that favorable results of the requested DNA testing would establish the applicant's actual innocence of the crime of conviction. The statutory standard to obtain testing requires more than conjecture or speculation; **it demands a *prima facie* case that the DNA results, if exculpatory, would establish actual innocence**.

***Id.*** (emphasis added). In DNA testing cases, "an absence of evidence is not evidence of absence." ***Commonwealth v. Heilman***, 867 A.2d 542, 547 (Pa.Super. 2005). ***See also Commonwealth v. Smith***, 889 A.2d 582 (Pa.Super. 2005), *appeal denied*, 588 Pa. 769, 905 A.2d 500 (2006) (affirming denial of request for post-conviction DNA testing where absence of appellant's DNA from victim's fingernails would not establish appellant's innocence of victim's murder).

In addition to a showing of actual innocence, an equally important eligibility requirement under the DNA statute is Section 9543.1(d), which commands the petitioner to make a **timely** request for DNA testing.[6] ***See***

---

[6] The timeliness requirement under Section 9543.1(d) is unique to the DNA statute; it is distinct from the jurisdictional timeliness provisions under the PCRA, which do not apply to DNA petitions. ***See Williams, supra*** (explaining motions for post-conviction DNA testing are separate and distinct from claims brought pursuant to other general provisions of PCRA; thus,

42 Pa.C.S.A. § 9543.1(d)(1)(iii). The PCRA court is required to analyze the timeliness of the DNA petition under Section 9543.1(d)(1)(iii) and decide if the purpose of the applicant's request for post-conviction DNA testing is to delay the execution of sentence or administration of justice. ***Edmiston, supra*** at 578, 65 A.3d at 357.

In ***Edmiston***, the defendant was convicted of first-degree murder, rape, statutory rape and involuntary deviate sexual intercourse, stemming from events that occurred on October 5, 1988, when the defendant kidnapped the two-year-old victim, inflicted gruesome injuries on her, murdered her and left her body in a wooded area. On October 5, 1989, a jury decided in favor of a sentence of death for the defendant's crimes. Twenty years later, on September 30, 2009, the defendant filed a motion for post-conviction DNA testing.

In reviewing the PCRA court's denial of the defendant's DNA petition, the Supreme Court confronted the timeliness requirement of a motion for post-conviction DNA testing as an issue of first impression. ***See id.*** at 578, 65 A.3d at 356. The Court recited the statutory language under Section 9543.1(d), which governs the PCRA court's review of the DNA petition. ***See*** 42 Pa.C.S.A. § 9543.1(d). The Court continued:

> **The applicant, as the moving party, bears the burden of showing that the test is requested for the purpose of demonstrating actual innocence and not for delay**.

---

one-year jurisdictional time bar related to general PCRA provisions does not apply to motions for DNA testing under Section 9543.1).

Here, although the trial court purported to find that the motion was timely, it observed that it could not know with certainty whether the motion was filed merely for the purpose of delay. The PCRA court identified other factors to support its finding of timeliness, specifically referring to advances in technology, the nature of the issues raised in the serial PCRA petition, no claim of prejudice by the Commonwealth, and the sentence of death, but did not explain how these factors are relevant to **an assessment of timeliness under Section 9543.1(d)(1)(iii)**.

Respectfully, we agree with the Commonwealth that **the PCRA court's declaration that it could not know for sure what Appellant's incentive was for filing the petition for DNA testing demonstrates a misperception of the court's obligation to render a specific determination in this respect**. Timing determinations requiring examination of case-specific factors are not particularly unusual or difficult and, in any event, …, **any difficulty in the applicant's proof does not relieve the defense of its burden or the PCRA court of its duty.** … As difficult as it may be, **PCRA courts are specifically charged with making this determination.**

**Although the PCRA court did not make the requisite finding of timeliness, we see no need to remand for the court to do so because, …, our own review of the record and circumstances surrounding [the defendant's] post-conviction DNA testing request leads to the conclusion that this motion was untimely as a matter of law** and was forwarded only to delay further the execution of the sentence. …

**[The defendant] has known of the existence of physical evidence he now seeks to test since his trial over twenty years ago.** From that time to the present he has been represented by counsel, who knew of the statute, the technology, and the evidence, and who were vigorously pursuing post-conviction relief on his behalf. Under such circumstances, courts should exercise a healthy skepticism when faced with requests for DNA testing.

This is especially true when, as here, careful examination of the record reveals that [the defendant] is not a likely candidate to be exonerated by DNA testing.

\* \* \*

The PCRA court also spoke of "advances in technology," but as the Commonwealth notes, **the statute does not make advances in technology an excuse for failing timely to request DNA testing. The statute recognized that the testing available at the time of its enactment was of sufficient reliability that defendants could seek DNA testing, in cases where good faith claims of innocence were timely raised. [The defendant's] guilty status has not changed since his 1989 conviction; advances in technology allegedly occurring after that date do not explain why he, if truly innocent, did not seek immediate testing, or, at the very least, testing available as technology improved during the intervening years, rather than languishing on death row, all the while being supposedly innocent.**

\* \* \*

Taking into consideration the strength of the evidence proffered against [the defendant] at trial, as the DNA testing provision explicitly requires, [the defendant's] deliberate decision at the time of trial not to seek further scientific testing, his counsel's apparent decision not to seek DNA testing throughout these lengthy post-conviction proceedings, and the belated timing of the current claim, **it cannot reasonably be concluded that his DNA testing motion was made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.**

*Id.* at 578-81, 65 A.3d at 356-59 (internal citations and quotation marks omitted) (emphasis added). Thus, our Supreme Court affirmed the order denying post-conviction DNA testing, albeit on other grounds. *Id.* at 581-

- 19 -

82, 65 A.3d at 359. *See also Commonwealth v. Walsh*, ___ A.3d ___, 2015 PA Super 222 (filed October 23, 2015) (holding appellant failed to request DNA testing in timely manner, where appellant knew of existence of hammer at time of his trial in 2004 and did not seek DNA testing of hammer until 2014).

The take-away from *Edmiston* and *Walsh* is first that petitioners seeking DNA testing must exercise due diligence in pursuing requests for relief under Section 9543.1, or they will be ineligible for relief under the DNA statute. *See* 42 Pa.C.S.A. § 9543.1(d)(1)(iii); *Edmiston, supra*; *Walsh, supra*. Next, our Supreme Court made clear that Section 9543.1(d)(1)(iii) specifically charges the PCRA court to assess whether the petition is timely filed. *See Edmiston, supra*. *See also Commonwealth v. Scarborough*, 619 Pa. 353, 364, 64 A.3d 602, 609 (2013) (stating: "If the movant is successful in making this showing [of actual innocence] **and the court additionally determines the requirements of 42 Pa.C.S.A. § 9543.1(d)(1) have been met,** as well as determines the testing is not barred by the provisions of 42 Pa.C.S.A. § 9543.1(d)(2), the relief the movant receives is the trial court's ordering of the requested DNA testing on the particular evidence specified in the motion…") (emphasis added). This timeliness assessment is **mandatory** under the DNA statute, and stands as a threshold eligibility inquiry, regardless of whether the Commonwealth complains. *See id.*

Instantly, I am convinced Mr. Payne's current DNA request is untimely as a matter of law. At Mr. Payne's jury trial in 1986, Officer Miller and Detective Harman testified they collected physical evidence from the crime scene and submitted it to the FBI for testing and examination. Neither Mr. Payne nor his trial counsel made any claim at trial that the Commonwealth had failed to disclose the FBI's findings or that they were not made available to the defense during pre-trial discovery. In his direct appeal, Mr. Payne similarly made no claim that he was not privy to the FBI's findings discussed at trial.

On June 7, 1991, Mr. Payne alleged for the first time that the Commonwealth submitted for testing physical evidence found at the crime scene and withheld this evidence from Mr. Payne and trial counsel. On June 25, 1991, Mr. Payne filed a *pro se* motion for production of documents requesting, *inter alia*, a copy of the FBI report(s) used during the investigation of his crimes. On July 30, 1991, Mr. Payne filed a consolidated motion for discovery and a request for an evidentiary hearing renewing his request for the production of documents. On September 9, 1991, the court directed the Commonwealth to produce to Mr. Payne the results of the processing and tests done by the police or FBI.

The court held a PCRA hearing on October 1, 1991. Significantly, at the very beginning of the hearing, the Commonwealth stated on the record it had fully complied with the court's September 9, 1991 order and supplied

Mr. Payne with, *inter alia*, the FBI reports at issue.  **At no time did Mr. Payne dispute the Commonwealth's representation**.  During the hearing, Mr. Payne offered no argument that the Commonwealth had withheld exculpatory evidence.  Similarly, in his post-hearing brief, Mr. Payne abandoned any claim that the Commonwealth had withheld exculpatory evidence.  On June 26, 1992, the PCRA court denied relief.  In its supporting opinion, the court expressly stated:

> [Mr. Payne's] allegation that exculpatory evidence was withheld from him in the form of FBI reports is…without merit.  Testimony at the PCRA hearing indicated that all FBI information was in the possession of [Mr. Payne].  No further mention of this information was made in [Mr. Payne's] brief, leading this [c]ourt to the conclusion that the allegation of withholding exculpatory evidence is without merit.

(PCRA Court Opinion, filed June 26, 1992, at 29) (internal citation omitted).  Mr. Payne did not challenge this determination on appeal.

On July 10, 2002, the state legislature enacted the DNA statute at 42 Pa.C.S.A. § 9543.1 (effective 60 days later).  Mr. Payne waited almost ten years to file his petition on June 14, 2012, for DNA testing of the following items recovered from the crime scene: (1) brown head hairs found on Victim's nightgown and bedsheet (designated Q8 and Q11); (2) human blood (designated Q1, Q7-Q11, Q13-Q15, Q17-Q19); and (3) a brown pubic hair (designated Q16).  Astonishingly, Mr. Payne alleged he had no idea this potential "exculpatory evidence" existed and "[f]or the first time (ever) [he] was made aware that this important new evidence does exist and is

preserved and is available for DNA testing." (Petition for DNA testing, filed June 14, 2012, at 12, ¶ 19). Mr. Payne further claimed he "was just (for the very first time)—provided the proof that these exhibits/specimens Q8, Q11, and Q16, ever existed." (*Id.*) Mr. Payne alleged he received this information from the FBI (mailed to his attorney) on January 8, 2012. Mr. Payne represented: "I want to emphasize that (at no time previous to this) was I aware that the evidence/specimens Q8, Q11, Q16, ever existed. Only when the FEDERAL BUREAU OF INVESTIGATION, provided this information was [Mr. Payne] alerted to these specimens that existed." (*Id.* at 13, ¶ 19) (emphasis in original). At the April 19, 2013 hearing on Mr. Payne's petition for DNA testing, he testified he did not receive the FBI file until December 2011.

Without addressing if the petition was timely under Section 9543.1(d)(1)(iii), the PCRA court limited its review to whether Mr. Payne presented a *prima facie* case of actual innocence and granted Mr. Payne's DNA request. In this regard, the court neglected its **specifically charged duty** to make a determination of timeliness prior to granting relief. *See* 42 Pa.C.S.A. § 9543.1(d)(1)(iii); *Edmiston, supra*; *Scarborough, supra*. In my opinion, the "timeliness" of the DNA petition is an unwaivable statutory eligibility requirement. The Commonwealth did not have to raise a specific objection to Mr. Payne's DNA petition on timeliness grounds to avoid relieving "the defense of its burden or the PCRA court of its duty." *See*

*Edmiston, supra*. Notably, the DNA statute dictates the **petitioner's** burden under the statute (**see** 42 Pa.C.S.A. § 9543.1(c)) and the **court's** required review of the petition (**see** 42 Pa.C.S.A. § 9543.1(d)), to obtain DNA testing. The DNA statute affords the Commonwealth **an opportunity** to respond to an applicant's petition (**see** 42 Pa.C.S.A. § 9543.1(b)(1)), but nowhere does the statute require the Commonwealth to object specifically to the petitioner's claims or to respond at all. Even in the absence of any response by the Commonwealth to a DNA petition, the petitioner still bears the burden of complying with the requirements under Section 9543.1(c), and the court still must conduct review of the petition under Section 9543.1(d). **See** 42 Pa.C.S.A. § 9543.1(c); (d); **Scarborough, supra**. Just as the PCRA court was obligated to decide whether Mr. Payne presented a case of actual innocence to be eligible for relief under the DNA statute (**see** 42 Pa.C.S.A. § 9543.1(d)(2)(i)), the court was similarly required to assess the timeliness of the petition under Section 9543.1(d)(1)(iii).

The PCRA contains analogous eligibility requirements, which the PCRA court (and our Court) must decide are met, even in the absence of an objection by the Commonwealth. **See, e.g.,** 42 Pa.C.S.A. § 9543(a)(1) (explaining that to be eligible for relief under PCRA, petitioner must plead and prove by preponderance of evidence that petitioner has been convicted of crime under laws of Pennsylvania, and is at time relief is granted currently serving sentence of imprisonment, probation or parole for crime; awaiting

execution of sentence of death for crime; or serving sentence which must expire before person may commence serving disputed sentence). ***See also Commonwealth v. Ahlborn***, 548 Pa. 544, 699 A.2d 718 (1997) (explaining petitioner must be currently serving sentence of imprisonment, probation, or parole to be eligible for PCRA relief; plain language of statute requires denial of relief for petitioner who has finished serving his sentence; to grant relief at time when appellant is not currently serving sentence ignores statutory language). Thus, a defendant must be serving the sentence he is challenging in a PCRA petition as a preliminary statutory eligibility requirement that needs no specific objection to preserve it. In other words, the petitioner does not qualify for relief if he fails to meet the statutory eligibility requirements, regardless of whether the Commonwealth complains. Likewise, if the petitioner maxes out on the sentence at issue while his petition is pending, he no longer meets the statutory eligibility requirements for relief, and again the Commonwealth does not risk waiver by failing to raise the issue or to object. The timeliness requirement under the DNA statute is akin to the eligibility-for-relief requirements under the general provisions of the PCRA. Whether Mr. Payne filed his petition in a timely manner is a statutory eligibility requirement under Section 9543.1(d)(1)(iii), which the petitioner must plead and the court is bound to address as a threshold matter that cannot be waived. The Commonwealth's "duty" for purposes of a DNA petition is limited to taking steps reasonably

necessary to ensure that any remaining biological material in the Commonwealth's possession is preserved pending the completion of the proceedings. *See* 42 Pa.C.S.A. § 9543.1(b)(2).

The PCRA court's failure to conduct the necessary timeliness calculation does not require remand, however, because the record makes clear Mr. Payne's DNA request is untimely as a matter of law. ***See Edmiston, supra***. Quite simply, the record belies Mr. Payne's repeated allegations that he just received the FBI file in this case. Giving Mr. Payne the benefit of the doubt, at the very **latest**, Mr. Payne received the relevant documents in 1991 during litigation of his first PCRA petition, **more than twenty years before filing his current request for DNA testing**. (***See*** PCRA Court Opinion, filed June 26, 1992, at 29.) Mr. Payne presents no evidence whatsoever to support his bald assertions that he "just" received the FBI documents. The fact that the FBI mailed his attorney **a copy** of the relevant documents by letter dated December 30, 2011, certainly does not prove Mr. Payne lacked possession of those documents earlier. Likewise, Mr. Payne's request for DNA testing fails to provide any evidence to support his claims that he tried to obtain the relevant FBI documents over the years, to no avail. Curiously, in his petition for DNA testing, Mr. Payne does not even allege that he recently learned of the blood samples he wants tested—he limits his claimed "new discovery" to the hair samples.

Additionally, the FBI file attached to Mr. Payne's DNA petition contains letters from the police dated December 20, 1981, and December 24, 1981, requesting testing and examination of physical evidence recovered from the crime scene. The attached FBI file also contains the FBI's analyses of the physical evidence by documents dated December 21, 1981, December 30, 1981, February 18, 1982, and January 24, 1983. Nowhere in his DNA petition does Mr. Payne assert that the FBI file he "just" received contains **new** documents, or anything other than the documents Mr. Payne had in his possession in 1991.

Moreover, Mr. Payne did not even need the FBI documents to request DNA testing. Mr. Payne knew at the time of his trial that police had collected and submitted for testing and examination physical evidence recovered from the crime scene. Mr. Payne could have requested DNA testing of the physical evidence recovered in or around 1995, when DNA technology became widely available. Alternatively, once our legislature enacted the DNA statute in 2002, Mr. Payne could have petitioned the court for DNA testing of the physical evidence recovered from the crime scene. Nothing in the record indicates that Mr. Payne exercised due diligence in pursuit of his current request for DNA testing. Rather, the record makes clear Mr. Payne had the relevant FBI documents in his possession in 1991, and failed to request DNA testing for more than twenty years. Under these circumstances, Mr. Payne's belated request for DNA testing is untimely as a

matter of law. ***See Edmiston, supra***; ***Walsh, supra***.

In my opinion, the PCRA court erred when it granted Mr. Payne's petition for DNA testing, without examining the timeliness of the petition, because the petition was untimely under Section 9543.1(d)(1)(iii) as a matter of law. I also agree with the other dissenting opinion that Mr. Payne failed to set forth a *prima facie* case of actual innocence under the facts of this case. Accordingly, I dissent on both bases.

Judge Stabile concurs in the result.