J-S31025-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAMAR P. OGELSBY | : | |
| | : | |
| Appellant | : | No. 535 EDA 2022 |

Appeal from the PCRA Order Entered January 24, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005339-2012

BEFORE:   BOWES, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                **FILED JANUARY 12, 2023**

Appellant Lamar P. Ogelsby appeals from the order denying his third petition under the Post Conviction Relief Act[1] (PCRA) as untimely.  Appellant argues that he successfully met the government interference exception to the PCRA's time-bar and that the Commonwealth committed a **Brady**[2] violation.  Following our review, we affirm.

The PCRA court summarized the facts of this case as follows:

On December 24, 2006, at approximately 3:00 a.m., Officer Tyrone Harding of the Police Department of the University of Pennsylvania was patrolling his district when he heard gunshots, and then a woman screaming.  He drove toward the sounds and found the woman on the 3900 block of Market Street.  The woman, Tamia Hill, was standing next to a prone and unresponsive male

---

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

[2] **Brady v. Maryland**, 373 U.S. 83 (1963).

named Robert Rose (the decedent), who was bleeding profusely from a wound in his chest. The decedent was lying in the bike lane on the south side of Market Street. The decedent subsequently died from his wounds. Philadelphia Police Officer Kenneth Bolton was called to secure the scene, where he found several shell casings in .45 and 9mm calibers. The casings were on the surface of Market Street. A total of eight .45 ACP fired cartridge casings were found at the scene of the shooting, along with thirteen 9mm Luger fired cartridge casings.

Khalif Hill lived at 3962 Market Street and knew the decedent through his cousin, Tamia Hill. At the time of the shooting, Tamia Hill lived at 3950 Market Street, across the courtyard from Khalif Hill, and was dating the decedent. Khalif Hill knew [Appellant] as "Kool-Aid." Immediately after the shooting, he came out of his residence and saw Tamia Hill and his cousin Troy Hill standing over the decedent. He stayed outside for a few minutes, but left when the police and emergency vehicles began to arrive.

Approximately one week later, Khalif Hill was questioned by members of the Homicide Division of the Philadelphia Police Department. He did not give a statement, but on September 30, 2010, almost four years later, he was arrested in connection with narcotics, and was again taken to the Homicide Division, at which time he told the police that he had seen the shooting, and that he had seen the two men who shot the decedent fleeing the scene. At that time, he told police that two men he knew as Mike and Kool-Aid shot the decedent, and that Mike held a black gun and Kool-Aid held a machine-gun style weapon with two hands. He identified Michael Gibbons and [Appellant] as the two shooters. He also said that Troy Hill told him that Mike and Kool-Aid had killed the decedent. He said that Troy also told him that the decedent had bought a car from Kool-Aid but the transmission failed, and that because Kool-Aid was unwilling to give the decedent his money back, he shot him instead. At trial, Khalif said that he had not actually witnessed the shooting or heard the shots and he did not see Mike and Kool-Aid leave the scene, but that otherwise his statement was truthful. He also said that he did not want to testify, and that he was nervous to do so because it could be dangerous.

Khalif Hill was held as a material witness in this case, due to the fact that he had tried to avoid giving testimony at the preliminary hearing and had actively evaded Commonwealth attempts to secure his testimony during the weeks prior to trial. He testified

that [Appellant's] uncle and another man broke into his house with a gun in the months before trial, robbed him, and asked him why he took the stand. He also testified that Michael Gibbons had encountered him a week before trial in the basement of the Criminal Justice Center and had asked him to change his testimony.

Tamia Hill was dating the decedent at the time of his death, and she was with him the day that he saw a Pontiac Bonneville for sale and asked [Appellant] about the car. The decedent decided to buy it, so they retrieved $3,500.00 in order to purchase it. Later, when she went with the decedent to transfer the title, she saw [Appellant's] name on the old title. They transferred the title into her name.

On the morning of December 23, 2006, Tamia Hill and the decedent had discussed the car and the issues that they were having with its performance. Later that evening, she heard the decedent preparing to leave the house, and the decedent asked her brother, Troy Hill, to walk out with him because the car was acting up. Shortly thereafter, she heard gunshots and went outside to find the decedent lying in the street.

After the shooting, Tamia Hill accompanied detectives to the Homicide Division, where she gave a statement. She gave a second statement on February 25, 2007, in which she first mentioned the trouble with the Bonneville. She had never seen the car again after the shooting and she . . . reported it stolen.

Troy Hill, Tamia Hill's brother, had sold drugs for [Appellant] in 2007 or 2008. He worked with a runner named Nate, who was responsible for taking daily proceeds to [Appellant] or Michael Gibbons. He saw the decedent outside in the street on the night of the shooting, calling [Appellant's] name and complaining loudly about the Bonneville. He then saw the decedent approach local drug dealers who were, at that time, working with Nate; the decedent smacked them several times, reached into their pockets, and took money from them.

Troy Hill knew that the decedent was high on ecstasy and tried to calm him down, but the decedent would not be deterred, and after robbing the drug dealers he came back inside the Hill residence and then left again in search of the Bonneville. Hill went with him, but as soon as they went outside he saw [Appellant] and Gibbons running toward the decedent. [Appellant] told Gibbons "hit that

n---a," and both of them fired on the decedent. The decedent tried to run, but collapsed from his wounds.

Troy Hill did not talk to authorities about what he had seen, because he did not want to endanger his mother, who lived in the housing development at the scene of the shooting. In May of 2009, while he was in federal custody pending trial in two robberies, he spoke with federal prosecutors and an FBI agent. During his proffer, he said he witnessed this murder. At that time, his family had moved and would presumably no longer be in danger were he to say what he had seen. In August of 2009, Hill entered into a plea agreement. He received a twenty-two year sentence.

Sean Harris lived at the housing development on the 3900 block of Market Street for several months during 2006 and knew the decedent well enough to say hello to him. He also recognized [Appellant], whom he knew as Kool-Aid. On the night of the shooting, he was driving his intoxicated friend home in his friend's Dodge Caravan, and he parked it across Market Street from the housing development. As he was opening the door to get out of the Caravan, he heard gunshots. He immediately got back in the Caravan. When he looked out the window, he saw [Appellant] shooting at least ten times at the decedent with a large black gun, held with both hands.

Harris called 911 immediately. However, because he was scared, he stayed in the Caravan all night. It was cold, and he turned the vehicle on in order to keep warm. At a certain point, it ran out of gasoline, and his friend went to get more. At approximately 7:00 in the morning, he finally emerged from the vehicle.

On December 27, 2006, Harris was approached by an officer from the University of Pennsylvania's Police Department. The officer asked him if he was okay, and he said that he was not, and that he had not slept since he saw the decedent's murder. When the officer entered Harris' information, he told Harris that there was an outstanding warrant for his arrest, and took him into custody. He was taken to the Homicide Division of the Philadelphia Police Department and interviewed by detectives about the murder.

Initially, Harris told the detectives what happened but identified a different person as the shooter because he was afraid of reprisal if he identified [Appellant]. Later, he felt guilty about identifying the wrong person, and in January of 2012, while he was in custody on another matter, he was again taken to talk to detectives about

- 4 -

> this murder. He explained to them that he did not identify [Appellant] in 2006 because he was afraid for his own safety, but that in all other respects, his prior statement was correct. He confirmed that [Appellant] is the man he saw shoot the decedent. The Commonwealth did not offer him anything in consideration for his testimony, though he did testify that he had hoped that the detectives he spoke to would help him with his case.

PCRA Ct. Op. & Order, 1/24/22, at 3-6 (citation omitted and some formatting altered).

On April 12, 2012, Appellant was arrested and charged with murder, conspiracy to commit murder, firearms not to be carried without a license, carrying firearms in public, possession of an instrument of crime, and persons not to possess firearms.[3] Following a jury trial, Appellant was convicted of first-degree murder and conspiracy. On June 18, 2013, the trial court sentenced Appellant to a term of life imprisonment without parole for the murder conviction and a concurrent sentence of twenty to forty years' imprisonment for conspiracy. Appellant filed a timely post-sentence motion challenging the weight of the evidence, which the trial court denied.

Appellant then filed a timely notice of appeal to this Court. On direct appeal, Appellant argued that the Commonwealth failed to give pretrial notice of its intent to introduce evidence of Appellant's other crimes, that the Commonwealth engaged in prosecutorial misconduct during closing arguments, and the trial court erred in admitting evidence of Appellant's other crimes. *Commonwealth v. Ogelsby*, No. 3048 EDA 2013, 2014 WL

---

[3] 18 Pa.C.S. §§ 2502, 903, 6106(a)(1), 6108, 907(a), and 6105(a)(1), respectively.

- 5 -

10558206, at *4 (Pa. Super. filed Nov. 25, 2014) (**Ogelsby I**) (unpublished mem.). On November 25, 2014, this Court affirmed Appellant's judgment of sentence. **Id.**, 2014 WL 10558206, at *12. Our Supreme Court denied Appellant's petition for allowance of appeal on July 8, 2015. **Commonwealth v. Ogelsby**, 117 A.3d 1281 (Pa. 2015) (**Ogelsby II**).

On April 13, 2016, Appellant filed a timely, first *pro se* PCRA petition. The PCRA court appointed PCRA counsel, who filed amended petitions claiming that trial counsel was ineffective for failing to object to allegedly improper evidence that bolstered the credibility of two Commonwealth witnesses, Troy Hill ("Hill") and Sean Harris ("Harris"). Second Am. PCRA Pet., 1/13/17, at 20-27. Appellant also asserted that the Commonwealth committed **Brady** violations because it failed to disclose (1) evidence that Hill was arrested and charged for the shooting of Khalil Gardner and (2) the fact that the Commonwealth agreed not to charge Khalif Hill with a narcotics offense in exchange for his identification of Appellant. **Id.** at 35-42. Following two evidentiary hearings, the PCRA court denied Appellant's petition on February 10, 2017. On appeal, this Court affirmed the PCRA court's ruling. **Commonwealth v. Ogelsby**, No. 749 EDA 2017, 2018 WL 4290654 (Pa. Super. filed Sept. 10, 2018) (**Ogelsby III**) (unpublished mem.). Our Supreme Court denied Appellant's petition for allowance of appeal on June 10, 2019. **Commonwealth v. Ogelsby**, 214 A.3d 230 (Pa. 2019) (**Ogelsby IV**).

Appellant filed his second PCRA petition on June 19, 2019. Appellant subsequently retained PCRA counsel, who filed an amended petition on

Appellant's behalf. Therein, Appellant claimed that he satisfied the newly discovered facts exception to the PCRA's one-year time bar. Am. PCRA Pet., 9/16/19, at 7-11. Appellant also raised a substantive claim of after-discovered evidence asserting that Harris had recanted his trial testimony, and argued that the Commonwealth committed a **Brady** violation by failing to disclose that Harris had received a payment from Philadelphia's Crime Reward Fund in exchange for his testimony at trial. **Id.** at 11-18. Following an evidentiary hearing, the PCRA court concluded that Appellant satisfied an exception to the PCRA time-bar, but it denied Appellant's second PCRA petition on the merits on November 14, 2019. Appellant timely appealed, and this Court affirmed the PCRA court's order on December 30, 2020. **Commonwealth v. Oglesby**, No. 248 EDA 2020, 2020 WL 7780108 (Pa. Super. filed Dec. 30, 2020) (**Ogelsby V**) (unpublished mem.). Appellant did not file a petition for allowance of appeal with our Supreme Court.[4]

On March 18, 2021, Appellant filed the instant PCRA petition, his third. Therein, Appellant claimed that he had established the government interference exception to the PCRA time-bar. Appellant also filed a motion for post-conviction discovery, which the PCRA court denied on September 9,

_____

[4] While Appellant was litigating his second PCRA petition, he filed a petition for writ of *habeas corpus* with the United States Court for the Eastern District of Pennsylvania. The District Court granted Appellant a stay while he continued to pursue PCRA relief in the Pennsylvania Courts. **See Ogelsby v. Ferguson**, No. 19-CV-5598, 2021 WL 2935987 at *11 (E.D. Pa. filed July 13, 2021) (unpublished mem.). The stay is currently pending.

2021. On January 24, 2022, the PCRA court issued an opinion and order dismissing Appellant's PCRA petition as untimely. Appellant filed a timely notice of appeal and a timely Pa.R.A.P. 1925(b) statement.[5]

On appeal, Appellant raises the following issues for review:

1. [Appellant's] PCRA petition raised due process violations related to the Commonwealth's concealment of arrangements with witnesses Troy Hill and Sean Harris, whereby each received favorable treatment in exchange for cooperating against [Appellant]. Did the PCRA court err when it found these claims untimely?

2. To the extent the PCRA court nevertheless reached the merits of [Appellant's] *Brady* claim related to Harris, did the court err in holding that [Appellant] was not entitled to relief on this claim?

3. [Appellant] sought discovery in light of the many due process violations in his case. Did the PCRA court err in denying [Appellant] discovery?

4. [Appellant] sought relief in the form of striking the trial prosecutor's testimony at his PCRA hearing due to the PCRA prosecutor's violation of the [sequestration] order by discussing a prior witness' testimony with the trial prosecutor before he testified. Did the PCRA court err in denying this relief?

Appellant's Brief at 2.

In his first issue, Appellant argues that he has met the government interference exception to the PCRA time bar. Appellant's Brief at 35-40. Specifically, he claims that the Commonwealth committed government

---

[5] Although the PCRA court did not file a separate Rule 1925(a) opinion, as stated above, it did file an opinion explaining its reasons for dismissing Appellant's petition with its January 24, 2022 order.

interference by withholding information about two witnesses who testified at Appellant's trial. *Id.*

First, Appellant contends that the Commonwealth failed to disclose when Hill began cooperating with the Commonwealth regarding the murder of the decedent. *Id.* at 36-37. Appellant claims that the Commonwealth concealed the fact that Hill first spoke with detectives before his sentencing hearing for federal charges, and that Hill did so hoping to obtain leniency at sentencing. *Id.* at 37. Appellant claims that he made reasonable efforts to uncover this information by repeatedly seeking discovery materials regarding Hill, including two pre-trial discovery requests for ***Brady*** material and two discovery motions that he filed during the instant PCRA proceedings. *Id.*

Second, Appellant argues that the Commonwealth failed to disclose that the Commonwealth recommended that the trial court lift a probation detainer against Harris because Harris was cooperating with the Commonwealth. *Id.* at 37-38. Appellant asserts that the Commonwealth and Harris falsely denied that there was an agreement to lift Harris' detainer. *Id.* at 37-39. Appellant claims that because of these denials, he had no reason to believe that there was an agreement between Harris and the Commonwealth, and that Appellant made reasonable efforts to obtain information about the lifting of the detainer against Harris. *Id.* at 39.

Appellant also alleges that he discovered the materials underlying the Hill claims on November 12, 2019, and January 13, 2020, and the materials underlying the Harris claim on December 21, 2020. *Id.* However, Appellant

argues that he could not immediately pursue those claims because the appeal from the denial of his second PCRA petition was pending before this Court. *Id.* at 39-40. Appellant contends that the instant petition is timely because he filed it within one year of the date he could have presented his claims of government interference. *Id.* at 40.[6]

Appellant argues the PCRA court "misapplied the law regarding the governmental interference exception to the [PCRA] time bar." *Id.* at 35. Specifically, Appellant claims that the PCRA court erred when it concluded that the Appellant failed to act with due diligence. *Id.* at 36-37, 39. Appellant contends that following our Supreme Court's decision in *Commonwealth v. Small*, 238 A.3d 1267 (Pa. 2020), the public availability of a record is "no longer dispositive of the analysis of the timeliness of a PCRA petition." *Id.* at 35-36 (citing *Small*, 238 A.3d at 1286). Further, Appellant argues that the PCRA court ignored the holding of *Commonwealth v. Bagnall*, 235 A.3d 1075 (Pa. 2020), which held that due diligence does not require a defendant to assume that the prosecution and witnesses were untruthful. *Id.* at 36

---

[6] Appellant also argues, in the alternative, that our Supreme Court should revisit its precedent interpreting the PCRA's timeliness provisions. Appellant's Brief at 40-42. Appellant notes he has raised these arguments to preserve them for further appellate review. *Id.* at 40. This Court has explained that "[a]s an intermediate appellate court, we generally lack the authority to determine that the Supreme Court's decisions are no longer controlling. Instead, we are duty-bound to effectuate the Supreme Court's decisional law." *Commonwealth v. Brensinger*, 218 A.3d 440, 457 (Pa. Super. 2019) (citations omitted and formatting altered). Therefore, we decline to address these claims, but note that Appellant has preserved them by raising them in this Court. *See id.*

(citing **Bagnall**, 235 A.3d at 1091-92). Appellant asserts that, although the federal court unsealed the transcript of Hill's sentencing on November 21, 2014, Appellant was not obligated to search for it considering the Commonwealth's alleged misrepresentations about Hill's cooperation and plea agreement. **Id.** at 36-37 (citing **United States v. Troy Hill**, 2:09-cr-00574-JCJ-1, Order, 11/21/14).

The Commonwealth responds that Appellant knew about Hill's federal plea agreement at the time of his trial, and Appellant's trial counsel cross-examined Hill about his plea agreement. Commonwealth's Brief at 32, 34 (citing N.T. Trial, 6/12/13, at 52, 79, 146). Further, the Commonwealth argues that Appellant admitted in his brief in support of his petition for a federal writ of *habeas corpus* that his trial counsel knew of the timing of Hill's federal sentencing, and that Appellant argued to the District Court that his trial counsel was ineffective for failing to obtain the transcript of Hill's May 10, 2011 federal sentencing hearing prior to Appellant's trial in June 2013. **Id.** at 33, 35-36.

The Commonwealth further notes that, during Appellant's preliminary hearing, Appellant's trial counsel cross-examined Harris about his criminal record, probation detainer, and upcoming probation violation hearing. **Id.** at 40 (citing N.T. Prelim. Hr'g, 5/2/12, 96-103). The Commonwealth claims that Appellant could have discovered that the trial court lifted Harris' probation detainer by checking the docket associated with Harris' violation of probation (VOP) matter before Appellant's trial or at any time thereafter. **Id.** at 41. The

Commonwealth notes that the PCRA court found no credible evidence of any "secret agreement" between the Commonwealth and Harris. *Id.* at 41 & n.15. The Commonwealth concludes that Appellant has failed to establish that he acted with due diligence in obtaining this information. *Id.* at 38-40, 43.

Our review of the denial of PCRA relief is limited to "whether the record supports the PCRA court's determination and whether the PCRA court's decision is free of legal error." *Commonwealth v. Lawson*, 90 A.3d 1, 4 (Pa. Super. 2014) (citation omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." *Commonwealth v. Mitchell*, 105 A.3d 1257, 1265 (Pa. 2014) (citation omitted); *see also Commonwealth v. Davis*, 262 A.3d 589, 595 (Pa. Super. 2021) (stating that "[t]his Court grants great deference to the findings of the PCRA court if the record contains any support for those findings" (citation omitted)).

It is well settled that "the timeliness of a PCRA petition is a jurisdictional [pre-]requisite." *Commonwealth v. Brown*, 111 A.3d 171, 175 (Pa. Super. 2015) (citation omitted). A PCRA petition "including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final." 42 Pa.C.S. § 9545(b)(1). A judgment is final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S. § 9545(b)(3).

Courts may consider a PCRA petition filed more than one year after a judgment of sentence becomes final only if the petitioner pleads and proves one of the following three statutory exceptions:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii). It is the PCRA petitioner's "burden to allege and prove that one of the timeliness exceptions applies." *Commonwealth v. Albrecht*, 994 A.2d 1091, 1094 (Pa. 2010) (citation omitted and some formatting altered).

To invoke one of the timeliness exceptions, a petitioner must also file the petition "within one year of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2). Our Supreme Court has held that a PCRA court is precluded from considering a subsequent PCRA petition while an appeal from the denial of a prior PCRA petition is still pending. *See Commonwealth v. Lark*, 746 A.2d 585, 588 (Pa. 2000), *overruled on other grounds by Small*, 238 A.3d at 1286 n.12. Therefore, under *Lark*, a PCRA petitioner must file a

subsequent petition within the one year[7] of the conclusion of the prior PCRA appeal or the expiration of time to seek further review. *See Lark*, 746 A.2d at 588.

It is well-settled that "a *Brady* violation may fall within the governmental interference exception[.]" *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa. 2008) (citation omitted). In order to satisfy the government interference exception based on a *Brady* claim, "the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the exercise of due diligence." *Id.* (citation omitted); *see also Commonwealth v. Chimenti*, 218 A.3d 963, 975 (Pa. Super. 2019) (stating that "[t]he proper question with respect to Subsection 9545(b)(1)(i)'s timeliness exception is whether the government interfered with [the a]ppellant's ability to present his claim and whether [the a]ppellant was duly diligent in seeking the facts on which his claims are based" (citation omitted and formatting altered)).

"Due diligence does not require perfect vigilance and punctilious care, but merely a showing the party has put forth reasonable effort to obtain the information upon which a claim is based." *Commonwealth v. Cox*, 146 A.3d

_____

[7] At the time our Supreme Court decided *Lark*, Section 9545(b)(2) provided a petition had to be filed within sixty days of date the claim could have been presented. *See Lark*, 746 A.2d at 588. The General Assembly has since amended Section 9545(b)(2) to extend the filing deadline to one year for claims arising on or after December 24, 2017. *See* Act of 2018, Oct. 24, P.L. 894, No. 146, §§ 2-3.

221, 230 (Pa. 2016) (citation omitted).  A petitioner is not duly diligent when he was aware of the existence of evidence supporting his claims for several years before he sought to obtain it.  **See Commonwealth v. Edmiston**, 65 A.3d 339, 348-49 (Pa. 2013), *overruled on other grounds by **Small***, 238 A.3d at 1286 n.12.  Lastly, a **Brady** claim cannot satisfy Subsection 9545(b)(1)(i) if it is based on pure speculation.  **See Commonwealth v. Dickerson**, 900 A.2d 407, 411 (Pa. Super. 2006).

Here, Appellant's judgment of sentence became final on October 6, 2015, the date on which the time to file a petition for a writ of *certiorari* with the United States Supreme Court expired.  **See Commonwealth v. Ruiz**, 131 A.3d 54, 59 n.8 (Pa. Super. 2015); **see also** 42 Pa.C.S. § 9545(b)(3).  Accordingly, Appellant was required to file a PCRA petition on or before October 6, 2016.  **See** 42 Pa.C.S. § 9545(b)(1).  Therefore, Appellant's instant PCRA petition, filed on March 18, 2021, is facially untimely.

Appellant filed the instant PCRA petition within one year of January 29, 2021, the deadline for Appellant to petition our Supreme Court to review **Ogelsby V**.  **See Lark**, 746 A.2d at 588; 42 Pa.C.S. § 9545(b)(2).  As noted previously, Appellant argues that he has successfully established the government interference exception to the PCRA time-bar with respect to the instant petition.

In ruling on Appellant's petition, the PCRA court addressed Appellant's timeliness claim regarding Hill as follows:

[Appellant's] claim is based on [his] January 13, 2020 discovery of Hill's May 3, 2011 federal sentencing docket and transcript. [Appellant] claims that the Commonwealth misrepresented the timing of Hill's federal sentencing during trial by asserting that Hill was sentenced before he provided his statement to police, and Hill confirmed this during direct examination. [N.T. Trial, 6/12/13, at 55]. [Appellant] alleges that Hill's federal sentencing transcript reveals a cooperation agreement that the Commonwealth suppressed in violation of *Brady*. [Appellant] also alleges that the Commonwealth not only failed to correct Hill's false testimony, but also exploited it to bolster Hill's credibility in identifying [Appellant] in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) during Hill's direct examination and at closing argument. [Appellant] alleges that this claim could not have been discovered with due diligence prior to January 13, 2020.

This claim is untimely as it fails to meet both the newly discovered fact and government interference exceptions. [Appellant] has failed to demonstrate an exercise of due diligence in seeking Hill's federal sentencing information. Hill's sentencing transcript has been public record since 2011 and could have been discovered prior to trial through the exercise of due diligence. [Appellant] was aware of Hill's cooperation and plea agreement in federal court at the time of his trial in 2013 as his trial counsel cross-examined Hill regarding his plea agreement and sentencing at [Appellant's] trial. [N.T. Trial, 6/12/13 at 79, 146]. In [Appellant's] brief in support of his petition for a writ of *habeas corpus* filed on June 29, 2020 in federal court, [Appellant] alleged his trial counsel was ineffective for failing to object even though he knew the correct timing of Hill's federal sentencing because he had a printout of Hill's federal criminal docket at trial and that trial counsel could have obtained Hill's federal sentencing transcript prior to his trial. [Commonwealth's Resp. to PCRA Pet., 6/8/21, Ex. E, 53-57]. Additionally, Hill's federal sentencing transcript was available to [Appellant's] prior PCRA counsel during his first and second PCRA petitions. The discovery of the May 3, 2011 sentencing transcript does not reveal any new information about Hill's cooperation that was not already known at the time of trial.

Further, [Appellant] has not established that government officials in any way interfered or prevented him from raising this claim at an earlier date. [Appellant] has not demonstrated that any information about Hill's sentencing was suppressed by the Commonwealth. As [Appellant] has not proven that the failure to previously raise this claim was the result of interference by

government officials, the government interference exception does not apply and [Appellant's] claim regarding Hill is untimely. This Court did not hear any testimony regarding the [Appellant's] Troy Hill claim at the evidentiary hearing because the claim is untimely.

PCRA Ct. Op. & Order at 13-15 (some formatting altered).

With respect to Appellant's timeliness claim regarding Harris, the PCRA court explained:

This claim arises from [Appellant's] December 21, 2020 discovery of the May 15, 2012 notes of testimony for Harris' VOP hearing, which revealed an off-the-record conversation between Harris' attorney, Alison Lipsky, ADA Simon, and Judge Coleman wherein Harris was confirmed to be a cooperating witness in a homicide case and after which Harris' detainer was lifted.

[Appellant's] claim regarding Harris is untimely as it fails to meet either exception. At [Appellant's] preliminary hearing on May 2, 2012, [Appellant] was made aware of the fact that Harris had a detainer lodged against him and he was awaiting a violation hearing. Harris testified that he was incarcerated on a detainer from Judge Coleman because he had been arrested on a new case, which was withdrawn earlier that week. The docket for Harris' probation case stated the detainer was lifted on May 15, 2012, which was more than a year prior to [Appellant's] trial. The transcript of the May 15, 2012 VOP hearing and the circumstances surrounding the lifting of Harris' detainer could have been discovered prior to trial through the exercise of due diligence. There is also no evidence which shows that the Commonwealth interfered with [Appellant's] ability to raise this claim during an earlier proceeding. [N.T. Prelim. Hr'g, 5/2/12, at 67-68, 96-103].

*Id.* at 15.

Following our review of the record, we conclude that the PCRA court's determination is supported by the record and is free of legal error. **See Lawson**, 90 A.3d at 4.

The record reflects that Harris spoke with detectives about the decedent's murder and identified Appellant as the shooter on January 25, 2012. *See* N.T. Trial, 6/12/13, at 199-227. At that time, Harris admitted that he had falsely identified another person in 2006 because he was afraid of Appellant but felt guilty for identifying an innocent person. *See id.* Harris was in custody on a detainer from January 2012 through at least the date of Appellant's preliminary hearing.[8] *See* N.T. Trial, 6/13/13, at 29. Harris was admitted into the witness relocation program in 2012. *See* N.T. Trial, 6/11/13, at 13-18; N.T. PCRA Hr'g, 10/16/19, at 119. At Appellant's preliminary hearing on May 2, 2012, Harris again identified Appellant as the shooter and reaffirmed being frightened for his life. *See* N.T. Prelim. Hr'g, 5/2/12, at 43-68. At the same hearing, the prosecutor informed Harris that he would make efforts to move Harris out of the county jail to a different facility for Harris' safety. *See id.* at 66-68.

_____

[8] Our review of the record reveals that Harris' detainer was issued on January 12, 2012, and he had two hearings before Judge Robert P. Coleman on January 26, 2012, and May 8, 2012. *See* PCRA Appx., 3/18/21, at 153-54; R.R. at 824a-825a (docket entries for Harris' probation case, CR-4000-2009). Harris spent four months in custody awaiting the hearing for a technical violation, and his open charges had been withdrawn on April 30, 2012. *See id.* at 166; R.R. at 837a (trial disposition and dismissal form, 4/30/12). Judge Coleman lifted the detainer on May 15, 2012, shortly after Appellant's preliminary hearing. *See id.* at 142, 153; R.R. at 813a, 824a. Further, the record reflects that, on February 28, 2013, Judge Coleman granted Harris' petition to amend parole and modified Harris' parole from reporting to non-reporting, in response to Harris' assertions that he was afraid of Appellant. *See* Commonwealth's Resp. to PCRA Pet., 6/8/21, Ex. D (Order, CR-4000-2009, 2/28/13; Pet. to Amend Parole, CR-4000-2009, 2/14/13, at 1-2).

At trial, Harris testified that detectives did not speak with him about his open case, but that he hoped the Commonwealth would assist him. ***See*** N.T. Trial, 6/12/13, at 225, 229. Harris also testified that the pending assault charges against him were dismissed after the complainant, his wife, failed to come to court. ***See id.*** at 265. During the 2019 PCRA hearing, Harris again reiterated that his identification of Appellant was truthful and that no promises were made to him in exchange for his testimony. N.T. PCRA Hr'g, 10/16/19, at 18-23, 113-16, 125.

The record also reflects that Appellant had knowledge of Hill's federal plea agreement at time of his trial. ***See*** N.T. Trial, 6/12/13, at 48-54. Hill testified that he spoke to detectives about the Robert Rose murder hoping that by cooperating with the investigation, he would get a plea deal for his federal charges, and was ultimately sentenced to twenty-two years in prison, and would be eligible for parole in 2028. ***See id.*** Further, on cross-examination, Hill acknowledged he could have received a sentence of fifty years to life imprisonment with a mandatory minimum sentence of thirty-five years if he had not cooperated extensively with the federal prosecutor concerning his federal case in addition to his cooperation in the instant case by identifying Appellant as the shooter. ***See id.*** at 86-90. Hill continued that he hoped for further reductions in his federal sentence based on his cooperation with prosecutors. ***See id.*** We note that Appellant has acknowledged that his trial counsel knew that Hill identified Appellant as the shooter before Hill had a federal plea agreement. ***See*** Commonwealth's Resp.

to PCRA Pet., 6/8/21, Ex. E (Appellant's Brief in Supp. of Pet. for Writ of *Habeas Corpus*, 6/29/20, at 53-57 (stating that Appellant's trial counsel had Hill's date of sentencing in his trial file)).

Further, as noted previously, the PCRA court credited the Commonwealth's witnesses at the PCRA hearing and rejected Appellant's claim that there was a secret agreement between Harris and the Commonwealth.[9] *See* PCRA Ct. Op. & Order at 9. On this record, we note that Senior Deputy Attorney General Melissa Francis, Esq., testified that she and her subordinate Assistant District Attorney David Simon, Esq. did not agree to lift Harris' detainer in exchange for his cooperation. *See* N.T. PCRA Hr'g, 9/24/21, at 250-54. Additionally, ADA Simon, present during Harris' probation hearing before Judge Coleman, denied making an agreement with Harris. *See* N.T. PCRA Hr'g, 11/10/21, at 71-76. Further, Assistant District Attorney Andrew Notaristefano, Esq., denied making an agreement with Harris and further denied making any promises to Harris besides agreeing to relocate

_____

[9] Appellant's reliance on *Bagnall* is misplaced. In *Bagnall*, our Supreme Court held, in the context of a substantive *Brady* claim, that due diligence did not require the defendant to assume that the multiple statements made by the prosecution and the witness denying making an agreement regarding the witness's cooperation were untruthful. *See Bagnall*, 235 A.3d at 1091-92. In *Bagnall*, the defendant obtained the transcript of the witness's sentencing hearing after his trial, which indicated that there was an agreement between the witness and Commonwealth regarding a sentencing recommendation in exchange for his cooperation. *See id.* at 1091. However, instantly, the PCRA court found that there was no agreement between the Commonwealth and Harris based on credited testimony at the hearing supported by the record. *See* PCRA Ct. Op. & Order at 9. Therefore, *Bagnall* is not applicable to the instant case.

him to a different jail for his safety. **See id.** at 147-48, 151. ADA Notaristefano further stated at the PCRA hearing that he would have expected Judge Coleman to lift the detainer even without Harris' cooperation. **See** N.T. PCRA Hr'g, 11/10/21, at 84. Because the record supports the PCRA court's credibility determinations, they are binding on this Court and no relief is due. **See Mitchell**, 105 A.3d at 1265; **see also Davis**, 262 A.3d at 595.

In sum, Appellant has failed to demonstrate that he was duly diligent in seeking the facts on which his claims are based because he was aware of these facts at the time of his trial in 2013. **See, e.g.**, **Edmiston**, 65 A.3d at 348-49 (holding that a PCRA petitioner could not establish that he acted with due diligence in obtaining the autopsy photographs of the victim where the record revealed that he knew the photographs existed at the time of his trial, but he did not raise the claim until fifteen years later). Therefore, we conclude that Appellant failed to meet his burden to demonstrate that the Commonwealth interfered with his ability to present this claim. **See Albrecht**, 994 A.2d at 1094; **Chimenti**, 218 A.3d at 975; **see also** 42 Pa.C.S. § 9545(b)(1)(i).

For these reasons, we discern no error of law or abuse of discretion by the PCRA court in denying Appellant's petition as untimely. **See Lawson**, 90 A.3d at 4. Therefore, we affirm the PCRA court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/12/2023